Isaac S. Bowman and George W. S. Bowman, —— Brinker and Mary, his wife, formerly Mary Bowman, and Rebecca Bowman, by said Isaac S. and George W. S. Bowman, their next friend, the said Mary and Rebecca being infants under twenty-one years of age, and Albert T. Burnley, Appellants, v. Athanasius Wathen, and the Mayor and Common Council of the City of Jeffersonville.

The doctrine laid down by Lord Camden, in the case of Smith v. Clay, 3 Brown's Ch. Rep. in note, examined and confirmed, viz., "That a court of equity, which never is active in relief against conscience or public convenience has always refused its aid to stale demands, where the party has slept upon his rights for a great length of time. Nothing can call forth this court into activity but conscience, good faith, and reasonable diligence. Where these are wanting, the court is passive and does nothing; laches and neglect are always discountenanced; and therefore, from the beginning of this jurisdiction, there was always a limitation of suit in this court."

Also the doctrine laid down by Lord Redesdale, in Hovenden v. Lord Annesley, 2 Sch. and Lef. 636, "that every new right of action, in equity, that accrues to a party, whatever it may be, must be acted upon at the utmost within twenty years."

And though the claimant may have been embarrassed by the frauds of others, or distressed, it is not sufficient to take the case out of the rule.

The doctrine has also been ruled by this court, and should now be regarded as the settled law.

In this case, the complainants have so long slept upon their rights that this court must remain passive, and can do nothing; and this is equally true, whether they knew of an adverse possession, or through negligence and a failure to look after their interests, permitted the title of another to grow into full maturity.

This was an appeal from the Circuit Court of the United States for the district of Indiana, sitting as a court of equity.

The facts are fully stated in the opinion of the court, and also the authorities referred to in the argument. It is unnecessary to repeat either.

Crittenden and Test, for the appellants.

Berrien and Legaré, attorney-general, for the appellees.

Mr. Justice DANIEL delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court of the United States for the seventh circuit and district of Indiana. The complainants in the Circuit Court, the appellants here, filed their

bill in the year 1840. It is alleged and shown, that with the exception of Albert T. Burnley, who is a citizen of Kentucky, the complainants are citizens of Virginia, and heirs and devisees of Isaac Bowman, deceased, who was an officer in the Virginia regiment, known as the Illinois regiment. That in the division and allotment of the lands appropriated by the state of Virginia for compensating the officers and soldiers of this regiment, a tract of land of five hundred acres on the Ohio river, within the county of Clarke, in the then territory and now state of Indiana, was, in 1786, allotted and conveyed to said Isaac Bowman, for his services in the regiment above mentioned. That Bowman, being seised in fee of this land, afterwards, in March, 1802, by a power of attorney under his hand and seal, constituted one John Gwathney, his attorney in fact, with full authority to lay off a town on the same, beginning at the lower part thereof on the river, and to contain one hundred and fifty acres of land. That by this instrument Gwathney was authorized to lay off the town in any manner he might prefer; to convey the title to the land forming the site thereof to proper trustees; to sell the lots on whatever credit he might think proper, and to do every other act which might be necessary for carrying into effect the powers with which the said agent was vested. That Gwathney proceeded to lay off the one hundred and fifty acres of land, to divide them into lots and streets for a town to be called Jeffersonville; reserving two acres for a public square, and certain lots for the benefit of his principal; designating also a portion of land on the margin of the river as a common. That he likewise caused a map or plan of the town to be made and recorded. This plan is made an exhibit in the cause. That, having laid off the town, Gwathney, on the 23d of June, 1802, by indenture, and for the consideration of five shillings therein expressed, conveyed to Marston G. Clarke and others, as trustees of Jeffersonville, the one hundred and fifty acres of land in conformity with the plan adopted; reserving to himself, as attorney for Bowman, the exclusive right of applying the money to arise from sales of the lots; the right also to have and use for and on behalf of Bowman, " whatever right he may now hold as proprietor, to the establishment of one or more ferries." It does not appear that Bowman was ever on the land after its allotment to him; he continued to reside in Vir-

ginia, where he died in the year 1826, having previously made and published his last will, whereby he devised, among other property, the ferry-right mentioned in the deed from Gwathney to the trustees of the town of Jeffersonville. That the devisees of Bowman, to whom were assigned his lands in Indiana and Kentucky, on the 11th of May, 1839, by deed, and for the consideration therein expressed of $20,000, conveyed these lands, together with the ferry-rights above mentioned to the complainant, Burnley, and have united with him in the institution of this suit.

As early as the 12th of October, 1802, little more than three months after the conveyance from Gwathney to the trustees of Jeffersonville, a license was granted by the territorial government of Indiana to Marston G. Clarke, one of the persons named as trustees of the town, to keep a ferry across the Ohio river from the town above mentioned. On the 2d day of July, 1807, a similar license was granted by the same government to one Joseph Bowman. In the month of December, 1822, one George White, having previously purchased the interest of Clarke, and of others claiming under Clarke, the legislature of the state of Indiana passed an act confirming to him the right to keep a ferry from Jeffersonville to the opposite shore of the Ohio.

These acts of the territorial and state governments were public and notorious; were parts of the recorded history of the country; the rights they purported to convey were such as could not be secretly enjoyed, and they appear to have been uninterruptedly exercised by the grantees. The three several ferries granted have been united, and have been transferred by purchase to the defendant, Wathen, conjointly with others, who are non-residents of the state of Indiana; and these purchasers, deriving title from the original grantees, have, from the commencement of their interest, exercised an ownership separately from, and independently of, either Bowman or the complainants, and exempt from any assertion of title by any of them, until the institution of this suit; showing an use and enjoyment of this ferry, for the space of thirty-eight years from the date of the grant to Clarke, and of twenty years from the confirmation by the legislature of the license to White.

The complainants, alleging that the Mayor and Common Council of Jeffersonville, as successors of the original trustees of the

town of Jeffersonville, hold the equitable estate in the ferry for the benefit of the heirs and devisees of Bowman, made the corporation joint defendants with Wathen to their bill; and prayed that the latter might be enjoined from using the ferry; that he might render an account of the profits thereof, and that general relief might be decreed them.

The answer of the defendant, Wathen, repels the claim of the complainants to the ferry, as having any foundation on the alleged reservation in the deed from Gwathney, or on any exception out of the estate passed to the grantees by that deed; relies upon the validity of the grants made by the territorial and state governments; upon the long and uninterrupted use and enjoyment of the ferry under those grants, and upon the position of the defend-ants as a purchaser without notice.

The corporation of Jeffersonville deny that they were created a corporation by the deed from Gwathney, or that they are the successors of the trustees appointed by that deed; and they claim their corporate character and powers from the authority of the legislature alone; they deny any riparian or ferry privileges as belonging to the complainants in virtue of the deed from Gwathney, and disclaim any part in the controversy between the complainants and Wathen.

Upon the hearing, the Circuit Court dismissed the bill with costs.

In the examination of this cause by the Circuit Court, and in its discussion here, an extensive range of inquiry has been opened, embracing questions upon the operation of that clause in the deed from Gwathney to the trustees of Jeffersonville, which relates to the ferry-rights claimed, as forming either a reservation or an exception according to the principles of the common law, and as affected, therefore, by the presence or absence of words of perpetuity: also upon the connection of these rights with, and their dependence upon, riparian ownership, and upon the necessity for their separation from the sovereign or eminent domain, to permit of their exercise by private persons. These are topics, however, which this court regard as beside the real merits of the present controversy, or as superseded by the true principles upon which it ought to be settled. The real question involved touches neither the definition of ferry privileges nor the modes of their enjoy-

ment; but relates exclusively to the propriety of interfering, at the instance of the complainants below, with those rights as they now are and have been enjoyed by the defendants, and of transferring such rights and enjoyment to the complainants themselves. The complainants are invoking the aid of a court of equity: if they have perfect rights, proper for the cognisance of a different forum, they can have no standing here; if, on the contrary, they require the interposition of this court, they must stand or fall upon the settled principles which govern its action. The frequency and explicitness with which those principles have been announced by this and other tribunals, would seem to dispense with any necessity for their repetition, and to impart somewhat the appearance of triteness to their recapitulation. They have been imbodied by Lord Camden, with a succinctness, and at the same time with a comprehensiveness, compressing within a few sentences almost a system of equity jurisprudence, when he declared, in Smith *v.* Clay, 3 Brown's Chancery Reports, in note, "that a court of equity, which never is active in relief against conscience or public convenience, has always refused its aid to stale demands, where the party has slept upon his rights for a great length of time. Nothing can call forth this court into activity but conscience, good faith, and reasonable diligence. Where these are wanting, the court is passive and does nothing; laches and neglect are always discountenanced, and, therefore, from the beginning of this jurisdiction, there was always a limitation of suit in this court." In a case very often referred to, Hovenden *v.* Lord Annesley, 2 Sch. and Lef., Lord Redesdale (page 636) lays it down as what he calls the common law of courts of equity, "that every new right of action in equity that accrues to a party, whatever it may be, must be acted upon, at the utmost, within twenty years." Hercy *v.* Dinwoody, 4 Bro. Ch. Rep. 257, was a case wherein the statute of limitations could not directly apply, for there had been a decree for an account that had not been proceeded in with effect; it was a case, therefore, in which the court proceeded according to its discretion, and not by any analogy with the statute of limitations; Lord Alvanley, in deciding this case, puts it upon the ground of public policy, and would not permit the account to be carried on, because the party who would otherwise have been entitled to it, had been guilty of such laches

as to render it impossible to settle the account accurately. In the case already mentioned of Hovenden v. Lord Annesley, Lord Redesdale strikingly illustrates the force and inflexibility of the principle on which he had been insisting, when he adverts to and disallows the circumstances adduced and relied on to modify the operation of that principle. After declaring that lapse of time, independently of the statute, would conclude the party in default, he proceeds to remark, that "it never can be a sound discretion in the court to give relief to a person who has slept upon his rights for such a lapse of time; for though it is said, and truly, that the plaintiffs in this suit and those under whom they claim were persons embarrassed by the frauds of others, yet the court cannot act upon such circumstances. If it did, there would be an end of all limitation of actions in the cases of distressed persons; for if relief might be given after twenty years on the ground of distress, so might it after thirty, forty, or fifty; there would be no limitation whatever, and property would be thrown into confusion." So Sir William Grant, in the case of Beckford and others, v. Wade, 17 Ves. 87, declares that "courts of equity by their own rules, independently of any statutes of limitation, give great effect to length of time, and they refer frequently to the statutes of limitation, for no other purpose than as furnishing a convenient measure for the length of time that ought to operate as a bar in equity of any particular demand."

This doctrine of an equitable bar by lapse of time, so distinctly announced by the chancellors of England and Ireland, has been ruled with equal force by this tribunal in the cases of Prevost v. Gratz, 6 Wheat. 481; of Hughes v. Edwards, 9 Wheat. 489; of Miller's heirs v. McIntyre, 6 Peters, 61; and of Piatt v. Vattier et al., 9 Peters, 405. It should now be regarded as settled law in this court.

Can the pretensions of these complainants bear examination by the standard which this rule ordains? The town of Jeffersonville was established, by the agent of the original proprietor of the site on which it stands, in June, 1802. The first ferry was granted by the territorial government in October, 1802; a period almost coeval with the creation of the town itself. This grant (like every other for a similar purpose mentioned in the record) was made in no union or connection of interests with the original

proprietor of the lands, but in a wholly separate and distinct interest. It is proved that the agent of the original proprietor resided in the immediate neighbourhood. He may be presumed, from his agency in laying off and selling the lots, to have been familiar with the localities of the place and with the interests and pursuits of the occupants. He is shown to have had knowledge of the existence of a ferry at the place, and to have availed himself of its accommodation like other passengers. The use of this separate and independent ferry-right has existed from the first grant to the institution of this suit, for a period of thirty-eight years, without an intimation, during this interval, of a right in the complainants or in those from whom they deduce title. Throughout all this time, the holders of this ferry, with a feeling of security which circumstances were well calculated to inspire, have bestowed their care and their means upon an enterprise to which they were prompted, no doubt, by considerations of profit, but one not the less useful or laudable, nor less entitled to protection for that reason: an undertaking highly promotive of public advantage. Can these defendants, under circumstances such as are here enumerated, and consistently with the principles of this court, be now arrested in this enterprise? and this at the instance of persons who may in some sense be regarded as having prompted them to it, if not by express invitation or by the connivance of their agent, yet by their own long abandonment of whatever interest in the subject they may once have possessed? Such a proceeding would not accord with the maxims of a court " which is never active to give relief against conscience or public convenience," or " to a party who has slept upon his rights;" a court which " nothing can call forth into activity but conscience, good faith, and reasonable diligence." In this instance the complainants have slept, long slept upon their rights; by their want of reasonable diligence, others have been induced to embark in an undertaking against which these complainants had power to warn them; with respect to these parties, therefore, this court must remain passive, and can do nothing.

It was insisted in the argument for the complainants, that Bowman, the ancestor, having remained in Virginia until his death in 1826, never had knowledge of an intrusion upon his ferry-rights; and that without such knowledge, no presumption on the score

either of neglect or acquiescence could be allowed against him. In the first place, with regard to the fact of ignorance here assumed, this cannot be admitted; because it is proved that Gwathney, the agent, resided in the immediate neighbourhood: that from his agency in laying off and selling the lots, he was necessarily connected with the affairs of the town; and it is shown, beyond question, that he had knowledge of the existence of the ferry, and had actually used it at an early period after its establishment, though the precise time when, is not ascertained. Let it be conceded, however, that Bowman and his family omitted to inform themselves of the right set up to this ferry by others; it is not perceived how such a concession would strengthen the claim of the complainants, or impair the title of the defendant, as accruing from lapse of time. The defendant, or his grantors, did not enter under Bowman; nor in subordination to any title of his; they have always claimed under grants from a wholly different authority, and adversely to Bowman and to every one else. If Bowman, by negligence, or by a failure to look after and protect his own interests, permit the title of another to grow into full maturity, he thereby recognises the force of the principle of the bar by lapse of time, which creates a title as complete in equity as would be imparted by an express conveyance. This conclusion follows by regular deduction from all the authorities upon this doctrine of lapse of time, and is established by the express language of this court in the case of Boon v. Chiles, 10 Peters, 223, where, in speaking of one whose acts may make him a trustee by implication, it holds this language: " His possession enables him to have at least the same protection as that of a direct trustee, who, to the plaintiff's knowledge, disavows the trust, and holds adversely; as to whom the time runs from the disavowal; because his possession from thenceforth is adverse. The possession of the land is notice of a claim to it by the possessor, (Sugd. Vend. 753,) if not held by a contract or purchase; it is from its inception adverse to all the world, and in twenty years bars the owner in law and in equity." In conformity with this doctrine is the decision in Buchannon and others v. Upshaw, made during the present term of this court.

We consider the pretensions of the complainants below, the appellants here, to be, upon every correct view, within the opera-

tion of the equitable bar, by lapse of time : we hold, therefore, that the Circuit Court properly dismissed their bill, and we accordingly affirm the decree of that court.

### ORDER.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the district of Indiana, and was argued by counsel. On consideration whereof, it is now here ordered and decreed by this court, that the decree of the said Circuit Court in this cause be and the same is hereby affirmed, with costs.