V. Sanchez, Administrator, Appellant, vs. Thomas Dow et al., Appellees.

1. Equity will bar demands become stale by lapse of time, even though a trust be involved, if time and long acquiescence have obscured the acts of the parties, or other circumstances have given rise to presumptions unfavorable to its continuance.

2. J. F., executor of P. and L. and T. F., collected money for their estates in 1808, and acknowledged his indebtedness up to his death in 1823, conditioned upon the result of a claim of a third party against the estate. In 1830 a court in Louisiana decided adversely to the claim. A suit was brought in Matanzas against the executor of J. F. for his indebtedness, which ended in 1836 in a judgment against the executor. From that time till the bringing of this suit in 1876, so far as appears, no steps were were taken to enforce the debt, and no excuse given for the delay except non-residence of complainants and their ignorance of the claim. The ancestors, through whom complainants derive, or some of them, knew of the claim and took action in regard to it : *Held*, That under such circumstances the claim is a stale one and barred by lapse of time.

Appeal from the Circuit Court for St. Johns county.

The facts of the case are stated in the opinion.

*Fleming & Daniel* for Appellant.

*Wm. McCabe* and *John A. Henderson* for Appellees.

THE CHIEF-JUSTICE delivered the opinion of the court:

Appellees filed a bill in 1876 in the Circuit Court of St. Johns county against appellant as administrator *de bonis non*, with the will annexed of John Forbes, deceased. The principal allegations are, that in 1785 Wm. Panton, John Leslie and Thos. Forbes established a commercial house at St. Augustine, Florida, with branch houses at other points, under the firm name of Panton, Leslie & Company ; that in 1792 John Forbes, on whose estate appellant is administrator as aforesaid, was admitted to the partnership, the firm name of which was changed to John Forbes & Company ; that Panton died in 1801, Leslie in 1804, and Thos. Forbes in 1808, each leaving a will in which John Forbes was appointed one of the executors; that as such executor he took charge of their respective estates, and continued in charge till his death in 1823 ; that in 1808 he appropriated out of the funds in his hands as such executor the sum of sixty-two thousand Bahama dollars, which he retained on account of a claim to that amount by the heirs of Alexander McGilivray, of whom he was also executor; that in 1814 he entered into an agreement as executor of the four parties above mentioned with Alexander Gordon, George Gordon and others acting for themselves and in behalf of the other legatees and parties interested in said estates, by which, after reciting payment to legatees and persons entitled to shares of the several estates of their full proportion therein, he admitted the retention of the $62,000 for the purpose of answering any claim or claims of the McGilivray heirs or legatees, and promised to remit $59,000 thereof to England, and invest the same in the purchase of stock in the public funds to abide the result of any such claim, and promised also to execute a

declaration of trust to that effect—that he never did transmit the money to England, never executed the declaration of trust as promised, and never paid it to the heirs of Panton, Leslie and Thos. Forbes, nor has any one else paid it to them ; and that the claim of the McGilivray heirs was tried before the First District Court of Louisiana, in New Orleans in 1830, and was decided adversely to them.

It is further alleged that John Forbes well knew of the invalidity of the McGilivray claim, and that his retention of the $62,000 before and after 1814 was in fraud of the heirs and devisees entitled to it, and in breach of his duty as trustee and executor as aforesaid. That neither of the appellees had any knowledge of the facts of this fraudulent dealing and this breach of trust until within three months before the commencement of this proceeding, when the facts were discovered by their attorney and communicated to them, and that neither of them except Charles Black was ever in the State of Florida.

There are allegations of fraudulent transactions of John Forbes in regard to lands in Florida belonging to his testators, Panton, Leslie and Thomas Forbes, but this branch of the case seems to have been dropped in the court below, and need not be considered here.

The prayer of the bill, omitting that portion which relates to land transactions just mentioned, was for a decree against Sanchez, administrator, &c., for $62,000, with compound interest from January, 1809.

Defendant demurred to the bill for want of equity and for multifariousness. The court overruled the demurrer, and subsequently the defendant filed his answer, in which he avows his ignorance of the matters and things alleged in the bill and asks that full proof of same be required. He further denies that the bill makes a case showing liabil-

ity of defendant, in either his individual or representative capacity, for any fraudulent conversion by John Forbes of the assets of the estates of Panton, Leslie and Thomas Forbes, unless accompanied by an allegation that these assets came to defendant's hands, and also avers that no assets ever came to his hands except the sum of $260, which was consumed in expenses of collection.

An examiner was appointed to take testimony, and on consideration of his report, with an admission of appellee that appellant never received more than $260 as assets of the estate of John Forbes, the court gave a decree for appellee, based on the $62,000 claim, for $2,202,049.

The appellant assigns a number of errors, but, in view of the conclusion at which we have arrived, we think it unnecessary to discuss any of these except the sixth. That, in substance, is that the court erred in decreeing that appellant shall pay to appellees the amount of the debt adjudged to be due. Whether the demurrer to the bill was improperly overruled or whether the defendant is liable to such suit, either in his representative or in his personal capacity, or whether the bill presents a case for equity jurisdiction, considering the difference between the ecclesiastical courts of England and the courts of probate of this State, or whether the exhibits used in evidence were properly admitted, or, if not, whether the failure to have the objections to them adjudicated in the court below is to be considered in this court as an abandonment of the objections, or whether the court erred in finding upon the evidence that the estate of John Forbes is indebted to appellees—these, and other minor questions presented, we leave undetermined. The appellees thus practically having the benefit of their contention on these questions, have they made a case on the bill, answer and evidence which entitles them

to the decree rendered in their favor ?   We think not on the single ground, without reference to the sufficiency of others, that the claim is a stale one barred by the lapse of time.   In discussing the question whether it is so barred or not counsel on both sides mixed with it a discussion of questions arising on the statute of non-claim and the statute of limitations.   We think it unnecessary to give our views on those questions.   What we have to say in regard to the staleness of the claim will sufficiently dispose of this branch of the case.

On this subject the law is laid down by the Supreme Court of the United States, in the language of Lord Camden, thus : " That a court of equity, which never is active in relief against conscience or public convenience, has always refused its aid to stale demands.  Where the party has slept upon his rights for a great length of time nothing can call forth this court into activity but conscience, good faith, and reasonable diligence.   Where these are wanting, the court is passive and does nothing ; laches and neglect are always discountenanced, and, therefore, from the beginning of this jurisdiction, there was always a limitation of suit in this court."   Bowman vs. Walthen, 1 How., 189.   This is succinctly embodied in the syllabus of the case in these words : "An equitable bar arises from lapse of time in, cases not strictly within any statute of limitations, but within the rule which requires reasonable diligence to entitle a party to relief."   The same court, in Wagner vs. Baird, 7 How., 234, reiterates the doctrine as " so often asserted, that it is unnecessary to vindicate it by argument."   One of the reasons given for it is, that " length of time necessarily obscures all human evidence, and deprives parties of the means of ascertaining the nature of original transactions ;" and, of course, of any other

transactions. See also 2 Story Eq., §1520. Without multiplying authorities, we will only add that the doctrine is fully recognized and adopted in this State. Amos vs. Campbell, 9 Fla., 187. While in that case it was not applied, the reason was that the circumstances did not justify its application, the court holding that " each case depends upon its circumstances and the discretion of the court ;" or, in the language of the syllabus, which was prepared by the Chief-Justice who delivered the opinion, that " there is no rule defining definitely what lapse of time will bar a purely equitable demand. Each case must depend upon its own circumstances."

The counsel for appellees contends that this doctrine can not be invoked in a case of fraudulent violation of trust, and says this is such a case. What is to be said as to the fraud which the counsel assumes to have been proved ? We find in the record as evidence of it, only the refusal or failure of John Forbes to pay over money he had collected for the estates of which he had charge as executor, alleging that he reserved it to abide the result of a claim of one McGilivray against the estates of his testators. There was no concealment, no denial of his possession of the money. In his agreement of 1814 with the heirs of his testators, he gave acknowledgment of the debt, subject to this claim. According to John W. Miller, who went to Pensacola in 1824, as attorney for one of the heirs, to look after this debt, he found in the books there an entry made in the handwriting of John Forbes, which corresponded with his other statements as to the debt; so, we see here no earmarks of fraud, unless the failure to send the money to England and to make a declaration of trust, as he had agreed to do, furnished some. But in the absence of any evidence to explain these matters, except a vague statement of Dalcour, executor of Forbes, in regard to the disturbed

state of public affairs in the region of the business, which, for aught that appears, may have furnished the excuse for not complying with his promise, we cannot hold that such failure does necessarily import fraud. So far from efforts being made to conceal or evade this indebtedness, at his death he left his matters in such shape that his executor charged his estate with the debt, accompanied with the explanation he had given himself in regard to it, but adding that his correspondence indicated that the money to pay it, when the McGilivray claim should be determined, would be found in the house of the Innerarity's, at Pensacola, thus confirming the report of Miller as to entry in the books there.

What is there besides on which to predicate the charge of fraud? It is alleged by appellees that he (John Forbes) well knew that the McGilivray claim was not a valid one. If that were so, his withholding the money under pretense that he was holding it to abide the result of that claim, would have been fraudulent. But there is no evidence of such knowledge on his part; and we do not find in the record that the allegation of appellees that when the claim was tried in Louisiana in 1830, it was decided against the McGilivray heirs in consequence of a letter of their ancestor, found among the papers of John Forbes, renouncing any claim he had against the testators of said Forbes, is sustained by any proof. It would be strange indeed that, notwithstanding so simple a solution of the merits of the claim, it took the court in Louisiana eleven days after the jury was empanelled in the case, to get it submitted to the jury for a verdict. The fact that the McGilivray heirs did press their claim in court, and that it was of such plausible strength as to cause a trial so protracted, verges well on to satisfactory proof that John Forbes was not

practicing a pretense when he set aside the money to await a decision of that claim.

We are therefore of opinion that the element of fraud is not to be considered as affecting the rights of the parties in this case.

The counsel for appellees insists that no length of time can effect a bar where a trust is involved ; whether the trusts devolved on appellant, considering that his administration was only anciliary, we have left undetermined. But suppose it did, is this position of the counsel correct in all cases ? Story thinks otherwise. He says " It is often suggested that lapse of time constitutes no bar in cases of trust. But this proposition must be received with its appropriate qualifications. As long as the relation of trustee and *cestui que trust* is acknowledged to exist between the parties, and the trust is continued, lapse of time can constitute no bar to an account or other proper relief for the *cestui que trust*. But where this relation is no longer admitted to exist, or time and long acquiescence have obscured the nature and character of the trust, or the acts of the parties, or other circumstances give rise to presumptions unfavorable to its continuance ; in all such cases a court of equity will refuse relief upon the ground of lapse of time and its inability to do complete justice. This doctrine will apply even to cases of express trust, and *a fortiori* it will apply with increased strength to cases of implied or constructive trusts." 2 Story Equity, p. 849, sec. 1520.

Taking the law as it is given here and in the authorities previously cited on the subject of lapse of time, where does it place the claim of appellees in this case—under a bar or not? The facts are that the debt arose in 1808 ; that in 1814 an agreement was entered into between Forbes, the debtor, and some of the heirs of his testators, professing to represent all the heirs, by which the payment of

the debt was postponed on account of the McGilivray claim against the testators; that the matter rested until the death of said Forbes in 1823, soon after which the McGilivray claim was put into court, but not finally decided till 1830, the decision being against the claim; that in 1836 the heirs of Thomas Forbes obtained a judgment in Cuba against the executor of John Forbes for a portion of their share of the $62,000, but whether that judgment was paid or not does not appear; that ever since, forty years before the commencement of this suit in 1876, the claim if not paid, at least in part, has been so neglected that so far as appears there was not in all that time, until shortly before this suit was brought, the slightest movement towards a continued assertion of it. What is the excuse given for this long delay? Only that appellees are non-residents, and never knew of the claim till shortly before authorizing this proceeding. But those through whom they derive, or some of them who professed to represent all, knew of it as far back as 1814, when they entered into an agreement with the debtor in regard to it. An attorney, representing one branch of the appellees' ancestors, was sent in 1824 to Pensacola to enquire into it, showing knowledge at that time of the claim. One of the Inneraritys in Pensacola was agent about that time for the Panton branch of legatees and heirs, and there was opportunity to get knowledge from him. The heirs of Thomas Forbes showed their knowledge of the claim by instituting the suit against the executor of John Forbes in 1836. But notwithstanding these indications that there was no lack of knowledge in those from whom appellees derive, and by which they should be bound, and notwithstanding the further fact that the interest of the legatees and heirs in the estates of the three testators was of such magnitude that it is not reasonable to suppose they would fail in efforts to

get themselves informed of the disposition of these interests, yet there is no trace of such effort. If they did so fail it was palpable and gross indifference and negligence which the law will not countenance. If they did not so fail, it is incredible that intelligent enquiry would not have rewarded them with a knowledge of the non-payment of the debt. That no step was taken to collect it for so many years justifies the presumption raised by the lapse of time that there had been either payment or an abandonment of the claim. We think, therefore, that this is a case in which the circumstances call for the application of the rule which bar claims that have become stale by lapse of time.

The decree is reversed and the bill dismissed.