UNITED STATES *v.* SAN JACINTO TIN CO.[1]

*(Circuit Court, D. California. March 23, 1885.)*

**1. PUBLIC LANDS—MEXICAN GRANTS—CONFIRMATION AND PATENT.**
　The confirmation and final location of a Mexican grant is conclusive against the United States, in the absence of fraud, and to set aside a patent the fraud must be extrinsic and collateral to the matter determined, and not matter upon which the decree was rendered.

**2. SAME—FRAUD—EVIDENCE.**
　The evidence to sustain charges of fraud against a number of government officers must be conclusive. Evidence *held* insufficient.

**3. SAME—REVIEW BY COURT.**
　The courts cannot review mere errors in location of Mexican grants by the proper officers.

**4. SAME—UNITED STATES AS SUITOR.**
　When the United States enters a court as a litigant, it waives its exemption from legal proceedings and stands upon the same footing with private individuals, and if, on a consideration of all the circumstances of the case, it be inequitable to grant the relief prayed against a citizen, such relief will be refused.

**5. SAME—LACHES AS DEFENSE.**
　Although, on grounds of public policy, no statute of limitations runs against the United States, and no laches in bringing a suit can be imputed to them, yet the facility with which the truth could originally have been shown by them, if different from the finding made, the changed condition of the parties and the property from lapse of time, the difficulty from this cause of meeting objections which might, perhaps, at the time have been readily explained, and the acquisition of interests by third parties upon faith of the decree, — are elements which will be considered by the court in determining whether it be equitable

[1] Affirmed. See 8 Sup. Ct. Rep. 850.

to grant the relief prayed. All the attending circumstances of each case will be weighed, that no wrong be done to the citizen, though the government be the suitor against him.

**6. SAME—PATENT SUSTAINED.**

As, under the circumstances of this case, it would be inequitable to vacate the patent, and impossible to place the parties *in statu quo*, the patent should not be annulled.

**7. SAME—RIGHTS OF STOCKHOLDERS.**

After a great lapse of time strangers purchasing stock in a corporation without actual notice of frauds committed before the creation of the corporation, and to which the corporation, as such, was no party, affecting title to lands held by the corporation, ought to be entitled to rely on the decrees of the United States tribunals affirming such titles.

In Equity.

*M. G. Cobb* and *G. Wiley Wells*, for complainant.

*Stewart & Herrin*, for defendant.

Before SAWYER and HOFFMAN, JJ.

SAWYER, J. This suit is brought by the United States, at the instance of, and upon an indemnity against costs given by, R. S. Baker, to accomplish in another form, in favor of the same and similar interests, the objects sought in *Manning* v. *San Jacinto Tin Co.* 7 Sawy. 422; S. C. 9 FED. REP. 726. In the cases, in many respects similar, of *U. S.* v. *Flint, U. S.* v. *Throckmorton*, and *U. S.* v. *Carpenter*, 4 Sawy. 42, affirmed in *U. S.* v. *Throckmorton*, 98 U. S. 61 and in other cases, it has been settled that the action of the proper authorities of the United States in confirming and finally locating Mexican grants in California is conclusive, unless there was fraud in the proceedings; and that the frauds authorizing the vacation of a patent must be frauds extrinsic or collateral to the matter tried by the first court or other tribunal, and not frauds in the matter upon which the decree was rendered or patent issued. The only allegations of fraud upon which the United States rely to take this case out of the established rule, relate to the location of the grant, and are found fully stated in paragraph 13 of the bill. The charges are that at the date of the location of the grant Edward Conway was chief clerk in the office of the United States surveyor general of California, and performed in relation to the location all the duties of the surveyor general; that George H. Thompson was the deputy surveyor who made the survey and location; that R. C. Hopkins, who made a report on the subject for the information of the surveyor general, was keeper of the archives in the office of the surveyor general; that B. C. Whiting was United States attorney for the district, representing the United States; that Joseph S. Wilson was commissioner of the general land-office at Washington, and the party who approved the location as such commissioner; that they all, at the time of the performance of their official duties in the premises, and at the time of the location of the grant and issue of the patent, owned interests in the *rancho* located and patented, the legal title being held by Conway in trust for himself and them, and other associates; that Conway, acting for the surveyor

general, in his official capacity directed the operations of the office, and in what manner the grant should be located, and that all these officers fraudulently conspired together to locate the land, and have the location finally approved by the commissioner and the secretary of the interior, on lands not within the exterior limits of the grant, and that this was done in order to fraudulently cover certain valuable tin mines, and that by this fraudulent conspiracy of government officers the grant was so wrongfully located and patented wholly without the boundaries of the grant. If these charges are not satisfactorily proved, there is no ground upon which this bill can be sustained.

The first peculiarity of the allegations that strikes the mind is the surprising and seemingly reckless charges made against so many prominent government officials,—all, indeed, from and including the commissioner of the general land-office himself at Washington down to the humblest officer who could have possibly had anything to do with the matter; and some of them personally well known for many years to every judge in the circuit as men having unblemished reputations for probity and honor. The charges are carefully made on information and belief, and not verified by any oath, 16 years after the issue of the patent. But every fact and implication of a fraudulent character, and not wholly consistent with honesty, entire good faith, and innocence, is categorically and distinctly denied in the sworn answer to the bill; and the burden of proof is thrown entirely upon the United States.

In our opinion, the proofs utterly fail to establish the fraudulent combination, or any of the acts of fraud charged. The direct proofs are all the other way. The uncontradicted, direct evidence is to the effect that no one of the parties charged, who was in a position to commit the fraud, except Conway, had any interest whatever in the grant at the time of the survey and location of the grant, or of the issue of the patent. Conway had purchased the grant and owned it in his own right, or for parties other than the persons charged with the frauds. His title was on record and known, or should have been known, to everybody. He called the attention of the surveyor general to his interest, and, owing to the delicacy of his position, offered to resign, but was retained in the office. For this reason, however, he refrained from acting in the matter, and had nothing to do officially with the location. This is the direct testimony, and it is uncontradicted.

The bill was, evidently, drawn with the decisions of the supreme court in similar defeated cases before the pleader, who, it would seem, was more solicitous to draught a bill that would be proof against a demurrer than to make it conform to the evidence under his control, to sustain the vital allegations of fraud. It is true that some time after the issue of the patent, upon the organization of the San Jacinto Tin Company, the other parties named, with many other prominent citizens in California, Pennsylvania, Washington, and elsewhere, took stock in the corporation. But at that time there was no reason why

they should not do so. The location was commenced under Surveyor General Beale, and completed and confirmed under Surveyor General Upson; some modifications having been made from time to time to accommodate the location to the demands of claimants of the adjacent lands; every step of the location having been contested by parties having their own adverse interests to protect, and these parties, too, the predecessors in interest of the real parties in this suit. The testimony fails to show that any of the parties charged with fraud had any interest in the lands before or at the time of the location and issue of the patent, except Conway, and fails to show any act of fraud on the part of any party alleged, while the direct testimony is to the contrary. Certainly, gross frauds should not be inferred alone from facts that are as consistent with innocence as with guilt, against a large number of distinguished men in high official positions, enjoying excellent reputations for honor and integrity, or regarded as established without the most convincing proofs. The evidence being wholly insufficient to establish any of the frauds charged, the only equitable or available ground upon which the bill rests utterly fails. We cannot review any mere errors of location. Says Mr. Justice FIELD in *U. S.* v. *Flint*, 4 Sawy. 61, affirmed in 98 U. S. 61:

"As to the alleged error in the survey of the claim, it need only be observed that the whole subject of surveys upon confirmed grants, except as provided by the act of 1860, which did not embrace this case, was under the control of the land department, and was not subject to the supervision of the courts. Whether the survey conforms to the claim confirmed, or varies from it, is a matter with which the courts have nothing to do. That belongs to a department whose action is not the subject of review of the judiciary in any case, however erroneous. The courts can only examine into the correctness of a survey, when, in a controversy between the parties, it is alleged that the survey made infringes upon the prior rights of one of them, and can then look into it only so far as may be necessary to protect such rights. They cannot order a new survey or change that already made."

Upon the question of fraud we state the result of our examination of the testimony without going into details. It would be an unprofitable task to discuss the vast mass of testimony, relevant, and irrelevant, in detail. But it may be well to refer to the great central fact upon which the other charges of fraud are based, and around which they are sought to be grouped, and upon which they rest for inferential support. It is confidently assumed on the part of complainants that the location of the land as patented is, palpably, wholly outside of the exterior limits described in the original petition, Mexican grant, and the decree of confirmation; that this is so obvious that the grant must have been willfully and fraudulently located where it is. This is an assumption that in our judgment is wholly without justification in the documentary and other evidence in the case. Upon a careful consideration of the subject we are of the opinion that the most that can be reasonably said against the location is that the record presents a fair case for an honest difference of opinion; that a

plausible argument can be honestly made in support of either side of the proposition. An erroneous location is certainly not so obvious as to necessarily stamp it as a fraud. The petition filed in February, 1846, asks a grant of land "within the limits of the known *rancho* of San Jacinto, whose *general desino* is in the office of the secretary of the governor, and shows in its *total extension* to be coterminous with the *ranchos* of Jurupa and San Bernardino towards the north, Temecula on the south, Huapa on the west, and San Gorgonio on the east."

The sub-prefect reports the land as being "the *remainder* which has been left untitled of the tract of San Jacinto Viejo and Nuevo, and which is *coterminous with the lands expressed in the petition,* and is shown by the *desino,* which I have before me." And the governor, upon said report, grants the "surplus land in San Jacinto Viejo and Nuevo as shown in the general *desino,* which appears in the foregoing." And in the final grant it is stated to be "that which results as a surplus in the *ranchos* San Jacinto Viejo and Nuevo, as shown by the general *desino* of both *ranchos,* which appears in the *expediente.*" The language of the decree of confirmation in the United States district court, which is controlling, is: "The lands hereby confirmed are the '*sobrante,*' or surplus, remaining within the boundaries of the *tract of land called 'San Jacinto,'* as the same is represented and described in the map of said tract contained in the *expediente* of Miguel Pedrorena, filed in this case and referred to in the grant, over and above certain lands granted to Jose Antonio Estudillo, and certain other lands granted to Miguel Pedrorena, *within the aforesaid boundaries,* [that is, the boundaries of the *whole* tract called 'San Jacinto,'] to the extent of eleven square leagues of land; and if the said *sobrante,* or surplus, within the *said boundaries,* should be less than eleven square leagues, then confirmation is hereby made to such less quantity." There was no juridical possession given of the grant, as the country passed to the United States before the performance of this act. The external boundaries were therefore left indefinite, and to be determined by the boundaries of the surrounding "coterminous" *ranchos.*

There had been two prior grants out of the tract known as "San Jacinto,"—one called "San Jacinto Viejo," or "Old San Jacinto," and the other "San Jacinto Nuevo," or "New San Jacinto,"—and the grant in question was out of the surplus, after satisfying the two former grants. There was a *desino* attached to the *expediente* in the new San Jacinto grant, prepared with special reference to the petition for that grant, and this was referred to in the several steps in the *expediente* of the *sobrante* grant in question. This is a rough proximate sketch made by O'Farrell without an instrumental survey, and, like most of the *desinos* appended to the petitions for Mexican grants, indefinite, but much better, more particular, and artistic than usual. This *desino* has a dotted line drawn around a tract, which is also divided by a dotted line to represent the two tracts of old and new San Jacinto,

which is represented as bounded by the Jurupa, San Bernardino, San Gorgonio, Temecula, and Huapa *ranchos.* The name of each outlying *rancho* is located in its supposed proper place, and all the *ranchos* together inclose the land supposed to be the whole tract known as San Jacinto. Any one reading the *expediente* and decree of confirmation, and looking at the *desino,* would say at once that the tract known as "San Jacinto," out of which the three tracts, Old San Jacinto, New San Jacinto, and El Sobrante San Jacinto were to be satisfied, included all the land, be it more or less, lying within the boundaries of the surrounding *ranchos* named. This was evidently the idea of the judge who confirmed the grant, which by the decree was to be satisfied out of the "surplus remaining within the boundaries of the tract of land called ' San Jacinto;' " not out of the tract called "Old and New San Jacinto," but out of the whole tract including those. For the purpose of construing the grant, the petition and all the papers in the *expediente* must be considered together. Looking at the petition, we find it stated that the "San Jacinto" referred to is described as lying between the *ranchos* named, and as actually shown on the *"general" desino* referred to; and it is expressly stated to be shown "in its *total extension* to be coterminous with the *ranchos* of Jurupa and San Bernardino towards the north, Temecula on the south, Huapa on the west, and San Gorgonio on the east." That is to say, it is expressly declared that the lands out of which the grant is to be made takes up all the space between those *ranchos,* and the sub-prefect's report states it to be "coterminous" with the lands expressed in the petition and shown by the copy of the *desino."* The grant refers expressly to the petition and the sub-prefect's report, and then grants the land "as shown in the *general desino."* The *desino* is in all these documents designated as the *"general desino,"* showing that it was only intended to indicate in a *"general"* way the location and extent of the lands out of which the grants were to be satisfied, and the general proximate location within that tract of the lands already granted, and was not intended to locate it with mathematical accuracy.

Upon looking at the *desino* it is plain to the eye that the boundary of this tract and of the surrounding *ranchos* was intended to be coincident or "coterminous," as is expressly declared in the petition and report. Now, if the boundaries were intended to be coincident, or the tract known as San Jacinto was intended to be "coterminous" with the surrounding *ranchos* mentioned, then the *sobrante rancho* is clearly located, and properly located, upon lands within the exterior boundaries of the grant. But it is claimed on the part of the United States that by taking the dotted line drawn around the old and new San Jacinto *ranchos* and applying the scale at the bottom of the *desino,* and running by courses and distances, although no courses and distances are stated in the *desino,* as indicated by the rough sketch in accordance with the scale, the lands included would not extend to the boundaries of the surrounding *ranchos* indicated, and that that line so as-

certained must be taken as the limit of the lands out of which these three *ranchos* must be satisfied; and that this dotted line thus located on the ground must govern, notwithstanding the express statement in the *expediente* that these boundaries are to be "coterminous," and notwithstanding the fact that they are shown on the "*general desino*" to be "coterminous." By this construction and mode of location, the *sobrante* grant is located outside the dotted lines and of the exterior bounds of the grant.

The surveyor general adopted the view that the exterior boundaries of the grant were "coterminous" with the surrounding grants, and located the *sobrante* grant on that theory, within those boundaries. Under the practice, the grantee was entitled to select the location in a compact form anywhere within the exterior boundaries where it would not conflict with any prior grant, and in this case there is no other valid or confirmed prior grant with which the location conflicts. Although, under the decisions of the supreme court of the United States cited, we are not called upon to determine this question, we are by no means satisfied that the surveyor general was not entirely correct in the view he took of the case. That is the view which would naturally and at first sight strike an ordinarily intelligent person, familiar with these Mexican grants, upon reading the *expediente* and decree of the court, and comparing them by the eye with the *desino*. Even a considerable portion, perhaps one-half, of the *old* San Jacinto *rancho*, as now in fact patented, is located outside the dotted lines on the *desino* drawn, as is claimed it should be, by complainants. But if the location in accordance with the view of the surveyor general be erroneous, the error certainly is not so obvious or palpable as to create a presumption of fraud or of a willfully unauthorized location, and however erroneous, in the absence of actual conspiracy or fraud on the part of the officials taking part in the location and approval, it is conclusive in this case. They were the officers or tribunals appointed by law to determine the location, and that determination, under the decisions already cited, is final and conclusive. The location was contested step by step till the issue of the patent, as will be seen by the communication of the commissioner of the general land-office addressed to the secretary of the interior, a copy of which is annexed to and made part of the answer. The survey was ordered by Surveyor General Beale on April 1, 1864, but in consequence of exceptions and appeals it was not finally completed and approved till December 10, 1866, after Mr. Upson succeeded to the office of surveyor general. In August, 1866, Abel Stearns filed in the surveyor general's office objections to the survey, and in his affidavit he sets up the same charges as to the interest of Hancock and Conway, and their unlawful and alleged fraudulent connection with the survey, as are now alleged in this bill as constituting the fraud and conspiracy upon which the patent should be set aside, and the questions arising upon these charges were necessarily examined and decided by the surveyor general.

Both the correctness of the location and the alleged frauds were again fully considered by the commissioner of the general land-office; other evidence as to the alleged frauds having been produced before him. Able counsel of the opposing parties were heard, and the location was fully confirmed by him, as appears by his letter to the secretary of the interior of May 22, 1867, a copy of which is annexed to and made a part of the answer. In this letter the commissioner gives a full history of the case, and of his action on it, and especially calls the attention of the secretary of the interior to the charges of fraud which are now set out in this bill, and to the documentary evidence on the subject, and requests the direction of the secretary of the interior as to what further proceedings should be had, and as to the issue of the patent. After holding the matter under advisement from May 22 till October 29, 1867, Secretary Browning rendered his final decision, affirming the location of the grant, and ordering the patent to issue, as appears from the letter of the secretary of the interior to the commissioner of the general land-office of October 19, 1867, a copy of which is also annexed to and made a part of the answer. Thus it appears that not only was the proper location of the grant fully considered by all departments of the government having jurisdiction, but these very frauds, now set up as grounds for vacating the patent, were fully considered and determined; and, if fraud there was, in fact, it is a fraud that was fully investigated in the proceeding, and adjudged, and it will not now authorize the canceling of the patent. It is true that in this bill the surveyor general and commissioner of the general land-office, as well as all their subordinates, are charged by the attorney general with participating in the fraud; but there is no sufficient evidence to support the charge. It is not at all probable that either of those officers, had they been guilty, would have considered and heard and decided these very questions with respect to their associates in crime, and then have especially called the attention of the secretary of the interior to the frauds, and invoked his re-examination of the charges made. Neither the secretary of the interior, who investigated and passed upon the charges of fraud, nor the president of the United States, who executed the patent, is charged with being a party to the frauds. The secretary, at least, was not deceived, for his attention was especially called to the subject by the commissioner himself, although one of the parties *now* charged, and the secretary thereupon examined and decided the whole matter.

We might well stop here, but there is another ground upon which the bill must be dismissed. To fully present this point will require a somewhat extended history of the proceedings in the case of this grant, and the presentation of the matter in a connected form will involve some repetition of matters already stated. It would, in our judgment, be inequitable at this late day, considering all the circumstances of this case, to vacate the patent, even if there had been some evidence of conspiracy and fraud on the part of the officers charged. "When

the United States enters a court as a litigant it waives its exemption from legal proceedings and stands upon the same footing with private individuals, and therefore if, on a consideration of all the circumstances of a given case, it be inequitable to grant the relief prayed against a citizen, such relief will be refused by a court of equity though the United States be the suitor." *U. S.* v. *Flint,* 4 Sawy. 43. Said Mr. Justice FIELD, in the case cited: "Although on grounds of wise public policy no statute of limitations runs against the United States, and no laches in bringing a suit can be imputed to them, yet the facility with which the truth could originally have been shown by them, if different from the finding made; the changed condition of the parties and of the property from lapse of time; the difficulty from this cause of meeting objections which might perhaps at the time have been readily explained; and the acquisition of interest by third parties upon faith of the decree,—are elements which will always be considered by the court in determining whether it be equitable to grant the relief prayed. All the attendant circumstances of each case will be weighed, that no wrong be done to the citizen, though the government be the suitor against him." Id. 58. If it can be inequitable to grant relief to the United States in any case, in view of all the surrounding circumstances, coupled with a great lapse of time, then this case affords a striking instance of that kind. Several of the leading parties charged, including the commissioner of the land-office and surveyor general, are now dead, or, for other reasons equally potent, their testimony cannot be had.

The petition for confirmation of the grant in question was filed, under the provisions of the act of 1851, to "*settle* private land claims in the state of California," on March 3, 1852. The claim was vigorously litigated in all the tribunals, original and appellate, having jurisdiction, and finally confirmed by the supreme court of the United States in 1864. *U. S.* v. *D'Aguirre,* 1 Wall. 311. On April 1, 1864, immediately after final confirmation, Surveyor General Beale issued instructions to Deputy Surveyor Thompson to make the survey; and he made the location. Exceptions were taken to it by parties interested in other claims of one kind and another, and this survey was returned by the commissioner of the general land-office at Washington to the surveyor general of California for further action; and it was afterwards finally located under the instructions of Surveyor General Upson, who in the intervening time had succeeded Beale; but the general location made under Beale's instructions was adopted with modifications to meet the demands of opposing claimants, exceptions having been taken to the location made. Before adopting or approving it, Surveyor General Upson required Mr. Hopkins, the keeper of the Spanish archives,—who is, doubtless, better informed on the subject of Spanish grants in California, and their *expedientes* and *desinos,* than any other man living, and whose aid has probably been called in at some stage of the proceeding in the case of every

grant presented for confirmation,—to examine the archives, the records of the land commissioners, and of the surveying department, and report the extent of the exterior boundaries of "San Jacinto" within which the grant could be located; and the propriety of the location to which exception had been taken. Mr. Hopkins made a thorough examination, and on September 18, 1866, made a very elaborate and lucid report, in which he expressed the opinion that upon an examination of the "original papers in the three San Jacinto cases, the *desinos* found in the Pedrorena case, and explained by the affidavit of Gasper O'Farrell, and the opinion of the supreme court," among others the following points were settled: "(1) That the exterior limits of the old Mission Rancho San Jacinto are the *ranchos* of San Bernardino and Jurupa, or Huapa, on the north; the Temecula on the south and south-west; the San Gorgonio on the east; the Guapa, or Huapa, on the north-west;" that the third grant, as to right of location, was the grant in question; and as the old and new San Jacinto claimants had selected and indicated their locations within the grant, and stipulated as to their western boundaries, that the *sobrante* claimants had a right to survey their 11 leagues in a compact form within the said exterior limits. Surveyor General Upson, after making sundry corrections on the exceptions of the predecessors of the promotors and managers of this suit, then represented by the leading counsel now managing this case for the ostensible complainants, but in the same and similar interests as before, and who was also the counsel in *Manning* v. *San Jacinto Tin Co.* 7 Sawy. 418, S. C. 9 FED. REP. 726, adopted the views of Mr. Hopkins, and finally approved the location as since patented.

This survey was again attacked before the commissioner of the general land-office, with great vehemence, as being improperly and fraudulently located outside of the bounds of the grant; the same grounds of fraud, the alleged false location, and the interest and connection of Conway with it,—the central point of fraud around which the minor acts set up are grouped,—having been alleged, and relied on to defeat the location. These questions were thoroughly argued before the commissioner, by able counsel, and after full consideration the location was confirmed. The commissioner, as we have seen, then referred the questions, with the record, exceptions, charges, and evidence of fraud, and briefs of counsel, to Mr. Browning, secretary of the interior, who, after long and mature consideration,—he having held the matter under advisement for over five months,—affirmed the decision of the commissioner, and directed the patent to issue; and it was, accordingly, issued October 26, 1867. Thus, after a protracted, tedious, and expensive litigation of nearly 16 years, between the United States and claimants of the land,—the last three and a half of which having been occupied in locating, and in contests over the location of the grant,—the patent was issued. The jurisdiction of all the appropriate tribunals having been exhausted,

the title was, at last, supposed to be "settled." The government appears to have been aided, in its endeavors to detect frauds and make the proper location, by the Argus eyes of all parties, desiring to take a part in the proceedings, making, or ever after hoping to make, under any pretense, adverse claims. Surely, under the circumstances, the location ought to be deemed correct, and it ought not to be disturbed except for the most cogent reasons.

On September 8, 1880, nearly 13 years after the issue of the patent, J. F. Manning, claiming interests as successor of Abel Stearns, being the same interests now represented by Baker, the prosecutor of this suit, with whom he (Manning) now appears, by the evidence, to be acting in concert, commenced in this court the suit of *Manning* v. *San Jacinto Tin Co.* 7 Sawy. 419; S. C. 9 FED. REP. 726, to declare a trust and control the legal title, under the patent, for his own benefit. The suit rested on the same grounds of false and fraudulent location as now set up in the name of the United States. The equitable opposing title of the complainant relied on, was the location of a large number of tin mines, under the customs of miners, made between 1866 and the date of the patent, long after the final confirmation of the grant in question, and during the progress of the contest over the location, and while the lands on which they were located were still *sub judice*, and at a time when there was no law by which any rights could be acquired in lands so situated. They were not then public lands, as held in *Newhall* v. *Sanger*, 92 U. S. 761.

On January 3, 1882, the bill was dismissed for want of equity, and on the several grounds that the complaint did not have a proper *status* to maintain the suit; that the facts did not show a case of fraud that was open to investigation, or other substantial equity, and that the equity, if any, was stale, for the reason, among others, that the statute of limitations applicable to private litigants had run nearly four times against the claim. That suit having failed, this suit was instituted in the name of the United States on April 3, 1883, nearly 16 years after the issue of the patent, when the litigation was supposed to be closed between the original parties to it, and more than 31 years after the litigation between the United States and defendant, and its grantors commenced by filing a petition for confirmation. Although the suit is brought in the name of the United States, it is as clearly, to all intents and purposes, a private suit of the parties instigating, prosecuting, and actually controlling it, as if brought in their own names. The attorney general, as a condition of assent to the use of the name of the United States, required a bond from Baker to indemnify the United States against any costs that they might be called upon to pay; and the consent, manifestly, would not have been given without this indemnity.

It appears from the letter of the commissioner of the general land-office to Secretary Teller, of March 2, 1883, that on the application

of R. S. Baker, who also seems to have furnished the draught of this bill, permission to bring the suit was recommended and given, in the language of the commissioner, "on the alleged ground of fraud in the survey of the land described in said patent; *said application being accompanied by the draught of a bill of complaint stating more fully the alleged grounds of action in the premises.*" After going briefly over the history of the grant, and the proceedings to confirm it, the commissioner concludes: "It will be seen, by the *corrected* diagrams referred to, that the Rancho El Sobrante de San Jacinto, as patented, as stated in the application referred to, is located entirely outside of the San Jacinto tract; but *nothing appears in the record of the case to verify the allegations of fraud contained in said application, nor aside from the grossly erroneous location 'to* CORROBORATE *them.'*" Notwithstanding this direct, positive statement of a want of evidence in the record to "verify" the charges of fraud made in the "application" and draught of the bill, or aside from what he is constrained to term, in opposition to solemn contrary decisions of his predecessors in office, who alone had jurisdiction to *finally determine* the question as to this particular grant, and did judicially determine it 16 years before, nothing but "the grossly erroneous location to corroborate them," he adds: "In consideration, however, of said allegations, and of the remarkable location of the tract in question, I respectfully recommend that *authority to bring suit* in the name of the United States for the purpose stated, be granted, *with such conditions as to the payment of costs and expenses as may be properly imposed.*"

The draught of the bill, application, and other papers were returned, and in accordance with this recommendation authority to use the name of the United States was given, upon giving a bond to indemnify the government against costs. The indemnifying bond having been furnished and filed in the case, the suit was instituted. The bill is signed by the attorney general as solicitor, and by the United States attorney for the district of California as counsel, manifestly, in form, to comply with the ruling of the supreme court on this point in *U. S.* v. *Throckmorton,* 98 U. S. 70. Since the filing of the bill, however, the whole proceedings have been conducted in the case, so far as we have observed, by the able counsel of the parties making the application for leave, and indemnifying the government,—the leading counsel being the same who was counsel for Abel Stearns in contesting the location of the grant 16 years and more ago, and who also was the counsel of record of complainant, and who in fact conducted and argued the case of *Manning* v. *San Jacinto Tin Co.* in this court, *supra.* Since the filing of the bill in this suit, we have seen no indication in any form of the guiding hand or supervising authority of the attorney general, or of the United States government. So far as our observation extends, neither has taken any part in conducting the case. Thus it appears that leave has been given to private parties, upon indemnifying the government, to prosecute a suit,

which they could not maintain in their own names, in the name of the United States, to vacate a patent issued to a party in pursuance of a final decision and location of a Mexican grant, in a proceeding between the same parties or their privies, at the end of 16 years' litigation, and nearly 16 years after the date of the patent, on the ground that the patent was fraudulently located, when, confessedly, there was no evidence of the alleged frauds presented to the officers of the government, except what appeared to the commissioner of the land-office to be a "grossly erroneous location" of the grant; whereas his predecessors, having the final jurisdiction over the matter, had fully examined the location, considered all objections of fraud, heard elaborate arguments upon them, and judicially determined the grant to be properly located.

The commissioner bases his opinion as to the "grossly erroneous location" of the grant upon a private survey, which he calls the "*corrected* diagram" of O'Farrell, *ex parte as to this grant*, at least, made in 1869,—two years subsequently to the issue of the patent in question,—in which he attempts to locate the exterior bounds of the San Jacinto tract with special reference to the dotted lines on the *desino* prepared by him a quarter of a century before, but without reference to the location of the boundaries of the surrounding *ranchos*, which are represented in the *desino*, and expressly described in the various documents constituting the *expediente* as being "coterminous" with the "tract called 'San Jacinto.'" This survey had been platted upon the maps of the public survey in the land-office and it is referred to as being, *at that time*, recognized "by this office, and the department as giving the out-boundaries of the tract of San Jacinto." However proper it may have been to make this recognition at that time with reference to grants within these out-boundaries still unlocated, and over which he then had jurisdiction, this recognition, it seems to us, should not affect rights vested in grants already regularly located by former commissioners and secretaries of the interior, who recognized different exterior boundaries, based upon a different construction of the *desino* and *expediente*, and diagrams then existing, but afterwards "corrected" for the purposes of other grants yet to be located. Rights of parties, once settled, should not be disturbed for light causes, depending upon varying opinions arising from a change of incumbents of the office having jurisdiction of the same *general* subject-matter, and especially where those changes of incumbents are frequent. The next commissioner and secretary of the interior may reject this O'Farrell survey and "corrected" diagram as "grossly erroneous," and adopt the original decision of Commissioner Wilson and Secretary Browning upon the point at issue.

O'Farrell himself, who made the *desino* in 1845, manifestly did not, in 1866, regard the dotted lines as the limit of the exterior boundaries of the "tract called 'San Jacinto,'" within which all these grants were to be located, as clearly appears from his affidavit made

in that year before the issue of the *sobrante* patent in question. He says that "he is the person who made the surveys of *a part of the tract of country called 'San Jacinto,'* [not the tract called 'Old and New San Jacinto'] shown on the hereto annexed diagram or map," (Exhibit A,) *including the specific tracts* called "San Jacinto Viejo" and "San Jacinto Neuvo,"—"a part," *not the whole,* of the "tract called 'San Jacinto;'" the annexed "diagram or map *including* the *specific* tracts called" "Old and New Jacinto," not the whole or general "tract called 'San Jacinto.'" "That the dotted line shown on the diagram represent the boundaries (being the *part* of the hills and mountains adjoining) of the *said respective tracts;*" that is to say, the said two *specific* tracts. "That the said lands,"—that is, the two tracts, Old and New San Jacinto,—"were *within* the tract known and called at the time, 'San Jacinto,'"—that is, within the exterior larger boundaries of that tract. "That said '*tract of San Jacinto*'" [in the singular number, referring to the larger tract, within which are Old and New San Jacinto, the two specific tracts mentioned] "extended, *as shown on said diagram or map, to the lands* then known as *San Bernardino,* and *Hurupa, Huapa, Temecula,* and *San Gorgonio.* The distance to the boundaries of said tract from the boundaries [said dotted lines, as shown on the diagram] of the *aforesaid grants*"—not of the tract within which they are located, but said grants—"of San Jacinto Viejo and San Jacinto Nuevo was not ascertained by deponent at the time he made the survey of *said grants,*"—not of the exterior limits within which the said two grants were located, but the limits of the specific location, within the exterior boundary. Thus O'Farrell, throughout the entire affidavit, clearly and sharply makes and keeps up the distinction between the "tract called 'San Jacinto,'" within the exterior limits of which the two specific tracts of Old and New San Jacinto, as well as the *sobrante* grant, were to be located, and the boundaries of the two tracts, granted out of the larger tract, which he sought to locate within the larger tract; and he only attempts to locate proximately the amounts of land called for in those two grants within the larger tract called "San Jacinto," in which all are to be located. At the time O'Farrell made the *desino,* the *sobrante* grant had not been made or thought of, and, of course, the *desino* was not made with any reference whatever to that grant. He makes it as plain as he can make it, in this affidavit, that the *dotted lines* are only intended to show the limits of those two tracts, and not the limits of the "tract called 'San Jacinto,'" which was to extend to the boundaries of the surrounding *ranchos,* wherever they might be; their distance from the line of his location not having been ascertained.

It is manifest that this is but a contest between private parties, for some supposed benefit of such parties, carried on at their own expense and managed by their own counsel, solely in their own individual interests, for the accomplishment of their own ends; and the parties maintaining the suit are not alleged in the bill to have any inter-

est in the litigation. In the former suit of *Manning* v. *San Jacinto Tin Co.* 7 Sawy. 419, S. C. 9 FED. REP. 726, the complainant's alleged interest was only in tin mines, alleged to have been located while the land was *sub judice,*—at a time when no private rights could, under the laws in force, be acquired in them.

Upon bald allegations of fraud in the application for leave to use the name of the United States, and in the draught of the bill submitted, not verified by oath or evidence produced, one citizen of the United States is allowed to harass others with litigation that ought to have been long since closed in fact, as it was supposed to be in law. If the United States have any real interest, it would seem that it ought to be litigated at the expense of the government itself, and upon the responsibility of its own officers. What makes the hardship greater, is, the litigation must be carried on mainly at the expense of the defendant thus harassed, even if it fully succeeds in its defense. The indemnity of the United States against costs only covers the fees of the several officers, advanced by the government, such as clerk's and marshal's fees, which the United States would be called upon to pay to these officers; for, whatever the result of the suit, the defendant cannot recover its own costs and disbursements, which must amount to several thousand dollars, besides counsel fees, against the nominal complainant, for the United States never pays costs to the opposing party. The defendant's costs and disbursements cannot be recovered from the instigators and managers of the suit, for whose sole benefit it is prosecuted, for they are not parties to the record. The costs against which the United States are indemnified, constitute but an insignificant item of the entire expense of the litigation. Thus, except as to the actual costs that must be advanced, the real complainants can harass the defendants with a long and costly litigation at the expense of the defendants thus permitted to be sued, whatever the result of the litigation. The parties do not litigate in such cases upon equal terms.

So far as lapse of time is concerned, as an element of equity, or want of equity, we think the case should be treated as though it were brought by the parties who instigated the suit, and who are paying the expenses and managing it for their own purposes. The statute of limitations of the state bars a suit, founded on fraud, in three years. This time had run five times over, after the frauds are alleged to have been perpetrated, before this suit was instituted, and every fact alleged, supported by evidence, as an element of fraud, existing at the date of the patent, was of record, and as well known then to the government, and to the leading counsel in this case, as it is now. The principal fact asserted, of "grossly erroneous location," was as palpable upon the record then, and as well known, as now. The fact that Conway owned the grant, and was chief clerk in the surveyor general's office, at the time of the location, was as notorious and well known at that time as now. These, and the alle-

gation that Conway managed the location, were the great central facts which formed the basis of all other charges. The charges, as we have seen, were called to the attention of the commissioner of the land-office, and of the secretary of the interior, and repudiated. The charge that Conway had anything to do with the location of the grant, and all other charges inconsistent with the integrity of the parties charged, are distinctly denied in the answer, and not only unsupported by evidence, but disproved by the witnesses examined. There is no other fact, of a fraudulent character, supported by the evidence, that was not, at the time, brought to the notice of the government, considered by the proper officers and tribunals, and decided. The element of staleness is, therefore, fully shown.

Again, when the United States come into a court of equity asking equity, they must, like a private party, do, or offer to do, equity. They cannot do equity in the present case, as it now stands. It is not disputed that the grant is a valid grant, and that the patentee and those holding under her are entitled to the land confirmed, somewhere within the exterior bounds of the grant. The proceedings for confirming and locating land grants under the act of 1851, and amendatory acts, were special; the jurisdiction being special, and not general. Outside the modes prescribed by the act there was no jurisdiction in the courts of the country. When a case had gone through the prescribed course to a patent, the jurisdiction was exhausted, and the officers became *functi officio*. Should this patent be annulled for fraud, in the exercise of the general equity jurisdiction of the court, neither it, nor any other tribunal or officer, has authority to, correctly or otherwise, relocate the grant, and the grant would fail. *U. S.* v. *Throckmorton*, 4 Sawy. 42. "The circuit court of the United States has now no original jurisdiction to reform surveys made by the land department of confirmed and patented Mexican grants in California." S. C. on appeal, 98 U. S. 61. Besides, on the issue of the patent, on October 27, 1867, the land within the exterior limits of the grant ceased to be *sub judice* as to this grant, and subject to such other disposition as the government should see fit to make of it. In this case, the evidence indicates that, subsequently to the issue of the patent, a railroad grant under acts of congress is claimed to have attached to the odd sections not covered by patents, and that other grants have been made of the even sections; so that there is no land, or at least but little, if any, left to satisfy this grant within the restricted limits insisted on by the complainants; and the grant would, also, be lost on that ground. Manifestly, the parties could in no respect be placed *in statu quo*. The United States are no losers, in fact. If the lands were erroneously located, the lands upon which the location should have been made remained in their stead, and they seem to have been disposed of by the government. The grant could be satisfied but once.

The corporation defendant was organized, and the title of the land

conveyed to it, in January, 1868, more than 15 years before the commencement of this suit. The testimony shows numerous stockholders,—the stock having changed hands to a greater or less extent from time to time,—most of whom are not charged with participating in the alleged frauds, and as to whom there is no evidence whatever showing notice, except so far as notice to the parties originally creating the corporation affects them. Are the interests of such stockholders to be jeopardized by reason of frauds practiced years ago by the original incorporators, prior to the existence of the corporation, admitting that there were such frauds? Is there no time during the life of a corporation—in this state 50 years—within which a stranger can purchase stock in a corporation without risking the loss of his investment, at the suit of the United States, on account of frauds perpetrated by those organizing the corporation prior to its creation? After a great lapse of time, strangers purchasing stock in a corporation, without actual notice of frauds committed before the creation of the corporation, and to which the corporation, as such, was no party, affecting the title to lands held by the corporation, ought to be entitled to rely on the decrees of the United States tribunals affirming such titles.

Those familiar with the notorious public history of land titles in this state need not be told that our people coming from the states east of the Rocky mountains very generally denied the validity of Spanish grants, and their proper limits or location, and, determining the rights of the holders for themselves, selected tracts of land wherever it suited their purpose, without regard to the claims and actual occupation of holders under Mexican grants, with a view of acquiring pre-emption rights, and title under the United States, at some subsequent period. Many of the older, best-authenticated, and most-desirable grants in the state were thus, more or less, covered by trespassing settlers. When the claims of Mexican grantees came to be presented for confirmation, these settlers aided the United States; the most formidable opposition usually coming from them, first, to the confirmation of the grants, on every imaginable ground, of which the most frequent was fraud in some form at some stage of the proceedings. When confirmed, and the officers of the government came to the location, the contest became still more vigorous and acrimonious; the trespassing settlers, or adverse claimants under other grants, seeking to have the confirmed grant located so as not to interfere with their claims or interests. One body of settlers or claimants would seek to move the location in one direction, and another, for similar reasons, in another. Thus the opposition to confirmation and location, from trespassers and contesting claimants, was more violent than the contest between the government and the petitioners for confirmation. Charges of fraud are easily made, and they were by no means sparingly made by incensed defeated parties, and these reckless charges by disappointed trespassing and opposing claimants, in

many instances, as in this case, involved the officers of the government, as well as the claimants under the grant.

These were the matters most embarrassing to the tribunals and officers appointed to adjudge them. It is not improbable that more or less frauds were committed in some of the many grants confirmed. But, if so, it is far more conducive to the public interest and public peace, as well as to private interests, that they should at this late day pass unpunished, than that this kind of acrimonious litigation should be indefinitely prolonged.

The United States compelled the Mexican grantees, willing or unwilling, to present their titles for adjudication, or, as an alternative, forfeit their lands; and for this purpose provided their own special tribunals to "settle" all questions of title and location. There were three opportunities for hearing, and at one time four, as to the confirmation: first, before the board of land commissioners, the tribunal of original jurisdiction; then successive appeals to the district, circuit, and supreme courts of the United States; in all of which, except the last, the parties were entitled to introduce further evidence. There were three hearings, also, in this case, as there usually were in others on the location: before the surveyor general, the commissioner of the general land-office, and the secretary of the interior. Surely a sufficient opportunity was afforded the government, with so much aid from vigilant adverse claimants, to discover and bring to light any weakness in the title, or any error or fraud in the location. If these tribunals have not been able, after so long, patient, and exhaustive a course of litigation, to properly settle the points in controversy, then there is little hope now, by a new course of litigation in the courts of ordinary jurisdiction, of reaching a correct result.

In view of all the circumstances surrounding this case, in connection with the long time that has elapsed since the issue of the patent, we think the equity, if any there be, stale, and that it would be to the last degree inequitable to annul the patent in question, or reopen the controversy as to the proper location of the grant. There should be some time, in the life-time of a generation, when land titles derived from Mexico through the United States should become "settled,"—some time when the United States should themselves cease to litigate, or allow private parties in their name to litigate, with their grantees the titles to lands derived through them from the Mexican government, and confirmed and finally located by the government itself. The interests of litigants themselves, of the state of California, of the United States at large, and the interests of public justice, and the public peace, require that an end be put to this kind of litigation.

In closing, we venture a single observation upon the practice which, unfortunately, as we think, to some extent prevails, of allowing private parties to litigate their claims, of the character in question, in the name of the United States. The United States either have a paramount interest in the lands adversely claimed by private parties,

which justifies them in suing such parties to enforce their rights, or they are legally or equitably bound to some third party, lawfully deriving title under the United States, to maintain the title in the courts for the benefit of such parties; or else they have no such interest as to justify litigation, or are not legally or equitably bound to litigate the title for the benefit of such other parties. It seems to us, therefore, that if the United States have such title or interests as justifies litigation, or if they are legally or equitably bound to maintain the title for the benefit of parties deriving title under them, then the United States ought to pay the expenses, and take the control and responsibility of the suits, and not require an indemnity for costs from private parties, and turn the litigation over to them. If, on the other hand, they have no such interest in the subject-matter of litigation, and are under no obligation to protect parties deriving title under them, then the United States ought not, upon indemnity against costs, or otherwise, to allow the use of their name, thereby lending dignity to the suit, to one set of private parties, who, in consequence of lapse of time, want of equity, or for other reasons, have no rights upon which a suit can be maintained in their own names to harass with protracted, tedious, and expensive litigation, another class of citizens claiming title under the same government. And the fact of requiring indemnity for costs, and of turning over the whole matter of litigation to the indemnifying parties, seems to us to be a strong indication that the government has grave doubts as to its having an interest in the controversy, or of its being under any obligation to litigate for the benefit of others, sufficient to justify their taking control or paying the costs of the litigation. In view of the long struggle to "settle" private land titles under Mexican grants in California, and in the interest of the stability of land titles and of the public peace, it is to be earnestly hoped that in future this privilege of using the name of the United States for the accomplishment of private ends will be more sparingly granted, and only granted upon the most urgent occasion, if such occasion there can be. It appears to us that leave to use the name of the government for purposes of litigation should not be granted upon the representation of private parties, confessedly not verified or supported by any substantial evidence produced by them.

The bill must be dismissed; and it is so ordered. We regret our inability to impose costs upon the real prosecutors of this suit.

---

Laches as defense in suits by United States. See *U. S.* v. *Southern Colorado Coal & Town Co.* 18 FED. REP. 273, and *U. S.* v. *Beebee,* 17 FED. REP. 36.

Suits against state and state officers. See *Parsons* v. *Marye, ante,* 113, and *Baltimore & O. R. Co.* v. *Allen,* 17 FED. REP. 171, and note, 188–197.—[ED.