*Union College of Law, Chicago, January* 7, 1882.

MARSHALL D. EWELL.

---

## MANNING *v.* SAN JACINTO TIN CO.

*(Circuit Court, D. California. January 3, 1882.)*

1. LOCATION OF MEXICAN GRANT—FRAUD—LACHES.

A Mexican land grant, made in 1846, was duly confirmed by the board of land commissioners, acting under the act of congress of March 3, 1857, the confirmation was affirmed by the supreme court of the United States as early as the December term, 1863, and proceedings for locating the grant were, under the decree of confirmation, pending between the United States and the claimant under the grant when the grantors of the complainant located certain mining claims under the act of congress of 1866. Subsequently a patent was issued to the claimant under the grant, embracing the land on which these mining claims were located. This bill was filed against the patentee in September, 1880, alleging that the grant was fraudulently located. *Held*, that the location was *res adjudicata*; further, that the suit was barred by lapse of time.

In Equity.

*M. G. Cobb*, for complainant.

*B. S. Brooks*, for defendant.

SAWYER, C. J. Demurrer to the bill. Briefly stated, it is substantially alleged that between July 26, 1866, and October 27, 1867, the grantors of complainant, without stating who they are or the particulars of their acts, in pursuance of the act of congress of July 26, 1866,

and the customs of miners of the district, located and claimed a large number of tin mines, some 400 claims, as I make the number, in the county of San Bernardino, and worked them in such manner as to secure the several claims and entitle them to patents under the acts of congress,—having expended on each claim over $1,000, and, in the aggregate, $175,000 prior to said October 27, 1867,—the lands on which said mines were located being at the time unsurveyed public lands of the United States; that in 1846 Gov. Pio Pico granted to Maria del Rosario Estudillo de Aguirre 11 leagues of land in what is now San Diego county, under the name of "Rancho Sobrante de San Jacinto Viejo y Nievo," said land being within larger exterior boundaries, and the surplus of other grants, and the survey to be commenced from the boundaries of two other named *ranchos*, situate in a tract of land theretofore known as "San Jacinto;" that in pursuance of the conditions of said grant said Maria entered upon said land, erected a house, and thenceforth to the present time lived thereon, and occupied and enjoyed said *rancho*; that on said October 27, 1867, the president of the United States issued a patent for said grant to said Maria, granting to her the said land granted by said Pio Pico by the name aforesaid, being the surplus remaining within the boundaries of the tract called "San Jacinto," as shown in the *espediente* of Miguel Pedrorena filed in the application for confirmation before the board of land commissioners over the lands granted to Estudillo and Pedrorena, said patent for a more particular description of the lands referring to a survey and plat annexed to said patent purporting to have been made by the United States surveyor general of California, and approved by him and by the commissioner of the general land-office, and the secretary of the interior; that he is informed and believes, and so *charges* the fact to be, that said land described in said plat and patent is not the land granted by Pio Pico and settled upon and occupied by said Maria, nor any part of the same, nor within the larger exterior boundaries from which said *sobrante* was to be taken; but that said land described in said plat and patent is situate in the county of San Bernardino, more than 6 miles at the nearest point, and more than 20 miles from the furthest point, away from said land; that said land was never surveyed in the field, but said plat was arbitrarily made up in the surveyor general's office without any *data* other than surveys of other *ranchos*, and without any regard to the decree of the court or said *espediente,* for the fraudulent purpose of surreptitiously embracing and securing said large number of tin mines

located and held as aforesaid. The bill then alleges a combination and fraudulent conspiracy between no less than three well-known deputies in the surveyor general's office, the United States surveyor general himself, the commissioner of the general land-office at Washington, and a participation therein by a large number of well-known and prominent citizens and officers, some residing at Washington and in the eastern states, of national reputation, for the purpose of fraudulently locating said grant upon lands beyond the exterior limits of the original grant in order to secure said tin mines; that notice was published, but not for the full time, and thereupon parties in interest other than complainant's grantor filed protests on various grounds, and among them on the ground that the location is not within the grant, and was made without regard to the decrée, juridical possession, *espediente*, or the actual possession and occupation by the said Maria; that these objections were overruled by a deputy surveyor general, and the plat reported without the objections to the commissioner of the general land-office; that the commissioner of the general land-office, upon a promise or conveyance of an interest in the grant if he would approve the plat and conceal the facts from the secretary of the interior and the president, did so approve the plat, conceal the facts, and recommend a patent, which was thereupon issued; that the defendant corporation was afterwards organized and the land conveyed to it on consideration of the stock issued to the parties in interest— the said several conspirators—and other parties, with full knowledge of the frauds alleged; that the said land so patented includes the said several tin mines so located and worked by complainant's grantors; that complainant "never knew or heard of the various actings and doings hereinbefore" * * * and in "this bill set forth, or any of them, until within two years last past;" that by reason of the patent to said Maria, complainant's grantor was prevented from applying and did not apply for a patent to said several tin mines, he believing the said patent to be paramount, and not knowing the said alleged fraudulent acts set out; that complainant has not applied for a patent for similar reasons, he supposing the title in defendant under said patent to be paramount till within three years last past, and not knowing the contrary till within two years last past.

The bill further alleges all these fraudulent acts set out to have been performed with the knowledge of defendant and of the said Maria, the grantee and patentee; but alleges no active participation on the part of said Maria, the patentee. Complainant asks that said

patent and subsequent conveyances to defendant be decreed to be void, and the defendant required to convey said several tin mines to complainant.

The patent described in the bill was issued upon a Mexican grant made in 1846, after confirmation by the board of land commissioners, affirmed by the United States courts on appeal, in pursuance of the act of congress of March 3, 1851, "to settle private land claims in the state of California." 9 St. 631. The effect of a patent issued upon such confirmation of a Mexican grant of the kind has been settled by the supreme court of the United States as well as by numerous decisions of the supreme court of California. In *Beard* v. *Federy*, 3 Wall. 491, the supreme court of the United States states the effect of such a patent in the following language:

"In the first place, the patent is a deed of the United States. As a deed, its operation is that of a quitclaim, or rather of a conveyance of such interest as the United States possessed in the land, and it takes effect by relation at the time when proceedings were instituted by the filing of the petition before the board of land commissioners. In the second place, the patent is a record of the action of the government upon the title of the claimant *as it existed upon the acquisition of the country*. Such acquisition did not affect the rights of the inhabitants to their property. They retained all such rights, and were entitled by the law of nations to protection in them to the same extent as under the former government. The treaty of cession also stipulated for such protection. The obligation to which the United States thus succeeded was, of course, political in its character, and to be discharged in such manner and on such terms as they might judge expedient. By the act of March 3, 1851, they have declared the *manner* and the *terms* on which they will discharge this obligation. They have there established a special tribunal, before which all claims to land are to be investigated; required evidence to be presented respecting the claims; appointed law officers to appear and contest them on behalf of the government; authorized appeals from the decisions of the tribunal, first to the district and then to the supreme court; and designated officers to survey and measure off the land, when the validity of the claims is finally determined. When informed by the action of its tribunals and officers that a claim asserted is valid, and entitled to recognition, the government acts and issues its patent to the claimant. This instrument is, therefore, record evidence of the action of the government upon the title of the claimant. By it the government declares that the claim asserted was valid under the laws of Mexico; that it was entitled to recognition and protection by the stipulations of the treaty, and might have been located under the former government, *and is correctly located now, so as to embrace the premises as they are surveyed and described*. As against the government *this record*, so long as it remains unvacated, *is conclusive. And it is equally conclusive against parties claiming under the government by title subsequent.* It is in this effect of the patent as a record of the government that its security and protection chiefly lie. If

parties asserting interests in lands *acquired since the acquisition of the country could deny and controvert this record*, and compel the patentee, in every suit for his land, to establish the validity of his claim, his right to its confirmation, and the correctness of the action of the tribunals and officers of the United States in the location of the same, *the patent would fail to be, as it was intended it should be, an instrument of quiet and security to its possessor.* The patentee would find his title recognized in one suit and rejected in another, and if his title were maintained, he would find his land located in as many different places as the varying prejudices, interests, or notions of justice of witnesses and jurymen might suggest. Every fact upon which the decree and patent rest would be open to contestation. *The intruder, resting solely upon his possession*, might insist that the original claim was invalid, *or was not properly located, and therefore he could not be disturbed by the patentee.* No construction which will lead to such results can be given to the fifteenth section. The term *"third persons,"* as there used, *does not embrace all persons other than the United States and the claimants, but only those who hold superior titles, such as will enable them to resist successfully any action of the government in disposing of the property."*

In *Teschemacher* v. *Thompson*, 18 Cal. 26, the supreme court of California, by Chief Justice Field, says:

"This instrument (the patent) is not only the deed of the United States, but it is a solemn record of the government of its action and judgment with respect to the title of the claimant existing at the date of the cession. By it the sovereign power, which alone could determine the matter, declares that the previous grant was genuine; that the claim under it was valid, and entitled to recognition and confirmation by the law of nations and the stipulations of the treaty; and that the grant was located, or might have been located, by the former government, *and is correctly located by the new government so as to embrace the premises as they are surveyed and described. While this declaration remains of record, the government itself cannot question its verity, nor can parties claiming through the government by* TITLE SUBSEQUENT. * * * But as the record of the government of the existence and validity of the grant, it *establishes the title of the patentees from the date of the grant."*

In this case that would be from 1846. And again:

"The 'third persons' against whose interest the action of the government and patent are not conclusive, under the fifteenth section of the act of March 3, 1851, *are those whose title accrued before the duty of the government and its rights under the treaty attached."* Id. 27.

This view was established in *Leese* v. *Clark*, 20 Cal. 412, 420, 423, and repeated in numerous other cases. See *Bissell* v. *Henshaw*, 1 Sawy. 565, and cases cited; and S. C. 18 Wall. 268.

In *Carpentier* v. *Montgomery*, 13 Wall. 495, the court says that the provision of the fifteenth section of the act of congress cited "was intended to save the rights of third persons not parties to the

*proceeding who might have Spanish or Mexican claims* independent of or superior to that presented by the claimant, or the *equitable* rights of other parties having *rightful claims under the title confirmed.*" The complainant has no pretence of a claim under any Spanish or Mexican grant to any part of the premises covered by the patent. His rights, whatever they may be, are alleged to have accrued under the act of congress of 1866, and, consequently, subsequent to that date. The patent is founded on a Mexican grant made in 1846, and its validity is not even questioned. The claim must have been presented for confirmation on or before March 3, 1853, as that was the latest date on which it could have been presented under the act of congress. 9 St. 633, § 13. It was, in fact, confirmed, and the decree of confirmation affirmed by the United States supreme court as early as the December term, 1863. *U. S.* v. *D'Aguirre,* 1 Wall. 311. The title was therefore settled, and it only remained to locate the grant, long before the rights of complainant had their inception. The proceeding for locating the grant, was, under the decree of confirmation, pending between the United States and the claimant under the grant when the act of congress of 1866 was passed and the mining claims were located, and the genuineness of the grant and its location are *res adjudicata,* under the authorities cited, between the United States and the patentee; and the adjudication is that the grant is "*correctly located,*" as well as valid. Cases before cited. The complainant, deriving whatever rights he has from the United States, one of the parties, subsequent to the institution of the proceeding for confirmation, is concluded by the determination. Besides, the grant must have been located either under the act of 1860 or the act of 1864. In either case the proceedings for location were in the nature of proceedings *in rem.* The complainant or his grantor could, under the statute, and should, have objected to the survey and location, and upon a decision against him have appealed to the commissioner of the general land-office, and if the decision was not satisfactory, to the secretary of the interior. He alleges that he did not file objections, but that parties other than himself or his grantors did, and alleged the very grounds now relied upon against the location, which were overruled. Nor does it appear that even they appealed. The complainant, then, has no standing to impeach the record on the ground of having a prior Spanish grant. His rights are subsequent and subject to the grant as located. He is equally without standing on the other ground; he alleges no "equitable rights," or "rightful claim

under the title confirmed;" he does not claim any interest under the Mexican grant, confirmed and patented, or that the patent was issued to the wrong party; he claims that the grant, though valid, and confirmed to the rightful party, was improperly located. He does not, therefore, bring himself within the classes of trusts protected in *Estrada* v. *Murphy*, 19 Cal. 272, and *Wilson* v. *Castro*, 31 Cal. 420, or in any other case cited.

But complainant has no standing to impeach the transaction on another ground. He has no apparent title from the United States. His right, whatever it may be, is, at best, only inchoate. It is a mere privilege; a first right to purchase, or pre-emption right under the acts of congress, of which he may avail himself or not as he chooses if he should succeed in vacating the patent. He is not bound to purchase of the government, and may abandon his claim at any moment. Neither he nor his grantor has ever tendered the purchase money to the United States or to defendant, or applied for a patent, and it so appears in the bill, and *non constat* that he ever will do either. He is in no better position as regards title, in his relation to the government, than the parties in *Hutton* v. *Frisbie*, 37 Cal. 481, and *Frisbie* v. *Whitney*, 9 Wall. 187. Complainant as yet has no privity with the government in the lands in dispute, and no ground for equitable relief on that score. *Doll* v. *Meador*, 16 Cal. 295. The United States, if anybody, is the party injured; and the right to vacate the patent for fraud, if any such right exists, is in the United States, and the United States should file the bill to vacate the patent. *Moore* v. *Robbins*, 96 U. S. 533. Justice can only be done, if at all, upon a bill filed by the United States—the party to the transaction, and the party injured. It is not claimed that the grant confirmed and patented is not valid and properly confirmed; but it is said it is improperly located. The patentee, then, is entitled to 11 leagues of land somewhere. Even upon a bill filed by the government, if the location should be vacated on the ground of frauds practiced by the officers in locating it, with or without the knowledge of the patentee, it is at least doubtful if it could be relocated in the proper place. The ordinary courts have no jurisdiction in the location of grants except in the mode prescribed by the special act of congress on the subject. But suppose *the complainant* should succeed in charging the defendant as a trustee, on account of fraudulent acts occurring *before he had any interest in the matter*, and obtain a decree for conveyance of the whole or a part of the land, there could be no relocation on

other lands, for the patent is not vacated, and the proceedings between the patentee and the United States are conclusive. The grantee has got the full amount of land called for in her grant, and she, or her grantee, has been compelled by the court to convey it to a party who has and claims no interest in the grant, legal or equitable. If the complainant can thus obtain a conveyance of a large part of the grant, under similar circumstances the whole can be taken, and the grantee under the Mexican grant would be left without any land, although adjudged to be entitled to 11 leagues. The court cannot do equity on a bill filed by the complainant alone, even if it can in any case. The complainant does not even offer to pay either the patentee or the government for the land. He proposes to take it under a decree of the court, so far as any offer is concerned, without payment of even the small sum required by the statute.

The United States is no party to the bill, and would not be affected by the decree. Clearly the United States is the proper party, and the only proper party, to a suit upon the facts set out in this bill. No decree could be rendered against the defendant in a suit by any other party which could do it justice, or protect and preserve its rights under the Mexican grant, confirmed and patented. The fraud charged, if it exists, certainly deserves the severest punishment; but the law does not punish it in that way. In my judgment, the case does not fall within the principle announced in *Johnson* v. *Towsley*, 13 Wall. 72, and followed in subsequent cases of a like character. *U. S.* v. *Flint*, 4 Sawy. 74. The complainant, in my opinion, is not in a position to maintain this bill. The genuineness of the grant and its *"correct location"* were the very questions in issue and determined in the proceedings for confirmation and segregation under the acts of congress, and these questions cannot be re-examined in other tribunals even upon a bill filed by the United States, as was held in *U. S.* v. *Flint*; *U. S.* v. *Throckmorton*; and *U. S.* v. *Carpentier*, 4 Sawy. 42, affirmed in 98 U. S. 61. In *U. S.* v. *Flint* I had occasion to observe that—

"It is a startling proposition to those who hold patents to lands issued upon confirmed Spanish or Mexican grants, that after 25 years of compulsory litigation, intended, in the language of the various acts of congress, to 'settle titles to land in the state of California,' the holders of all such patents are liable to be called upon to relitigate their claims with the government in the ordinary courts of justice; and that the patent, instead of being conclusive evidence of a 'settlement' of the title—the end of litigation—is but the foundation for the beginning of a new contest to unsettle it, in the tribunals

of the country, *which before had no jurisdiction whatever over the subject-matter.* The very institution of these suits in the name and by the authority of the government, was well calculated to produce, and undoubtedly did produce, a general distrust of such titles, and a wide-spread if not a well-founded alarm." Id. 85–6.

It is a still more "startling proposition," that any citizen at his own option, 13 years after a claim for confirmation of a Mexican grant has been presented to the proper tribunals of the country, and nearly three years after the decree of confirmation has been affirmed by the supreme court of the United States, and pending the survey and final location, and during the ordinary delays incident to issuing a patent, can by a mere entry or trespass upon the lands so claimed, and in litigation between the government and the claimant, *acquire a status* that will enable him to attack and avoid the whole proceedings, and for his own benefit control the title vested by the patent under the grant, in which grant he has no interest  In this case there is no attack on the genuineness of the grant.   It is only the location of the grant that is assailed.   Upon the inviolability of the location, Mr. Justice Field, with the concurrence of the circuit and district judges in *U. S.* v. *Flint,* 4 Sawy. 61, said:

"As to the alleged error in the survey of the claim, it need only be observed that the whole subject of surveys upon confirmed grants, except as provided by the act of 1860, which did not embrace this case, was under the control of the land department, and was not subject to the supervision of the courts.   Whether the survey conforms to the claim confirmed, or varies from it, is a matter with which the courts have nothing to do; that belongs to a department whose action is not the subject of review by the judiciary in any case, however erroneous.   The courts can only examine into the correctness of a survey when, in a controversy between parties, it is alleged that the survey made infringes upon the prior rights of one of them; and can then look into it only so far as may be necessary to protect such rights.   They cannot order a new survey, or change that already made."

This was said in a case where the United States was complainant in the bill.   *A fortiori* must this be true as to a party having the *status* of the complainant in this bill.   In the conclusions stated by *Hoffman,* J., in *U. S.* v. *Flint,* 4 Sawy. 84, 85, and especially in 1, 2, 3, and 6, I fully concur.   See, also, pages 86, 87.   The government, to carry out the provisions of the treaty, committed this whole matter to other and special tribunals, except so far as brought before the ordinary courts for review or appeal.   The circuit courts, in the exercise of their general and ordinary jurisdiction, had nothing to do with

it. If this location is .declared void in this proceeding, and the defendant be decreed to convey to the complainant, the court has no power to relocate the grant, or remand the case to any other court, board, or officer to relocate it; and although the *government* is satisfied with the location, the grantee of a genuine Mexican grant of 11 leagues will lose the land granted. The proceedings for confirmation and location of the grant having resulted in a patent after a 14 years' litigation, all the tribunals and officers to whom the special jurisdiction over the matter was committed have become *functi officio.*

If this court should now assume jurisdiction to vacate the location, it cannot do equity by giving other lands in place of those taken away. Besides, in the mean time, relying upon this location, other parties may have acquired from the government the title to all other lands upon which it might be located. These patents ought not to be lightly interfered with, at the will or caprice of parties entering upon lands claimed under Mexican grants pending proceedings for confirmation and location, and setting up *recent claims* under general· preemption laws, or laws authorizing the location and purchase of mines. Whether this case has any feature that brings it within any of the exceptions stated in the last cases cited, it will be time enough to determine when the United States files a bill to vacate the patent on the ground of the frauds charged. In my opinion, the bill presents no ground for equitable relief.

So, also, in my judgment, the suit, in analogy to the statute of limitations of the state, is barred by lapse of time. If complainant is entitled to any relief it is wholly on the ground of fraud. Such suits are barred within three years. Code Civ. Pro. § 338, clause 4. According to the allegations of the bill, the fraud was consummated October 27, 1867. The bill was filed September 8, 1880, nearly 13 years afterwards. The statutory period had, therefore, run more than four times before the filing of the bill, unless the case is within the provision that the cause of action shall "not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud." It is attempted to take the case out of the statute by the simple averment "that your orator never heard of the various actings and doings hereinbefore in articles 12, 13, 14, 15, 16, 17, 18, and 19 of this bill set forth, or any of them, until within two years last past." No reason is given for not discovering the fraud. There certainly should be some showing on this point, in view of the public and notorious acts alleged. The bill is singularly barren of allegations of specific facts, though amply full as to general charges

of facts and legal conclusions *on information and belief.* The complainant does not state who his grantor is, or who any one of the other locators of some 400 mining claims described as belonging to him is, nor when they, or any of them, were conveyed to him or his grantor, except that they were conveyed to his grantor before October 27, 1867, and to himself after that date. He mentions no date except the date of the act of congress of 1866, the date of the Mexican grant of 1846, and the patent October 27, 1867. No date of any of the deeds, act of incorporation, or other transactions since October 27, 1867, are given to enable the court to determine, from the facts, whether he ought to have discovered the frauds charged at an earlier date than alleged. For aught that appears, he may have received his conveyance from his grantor the day before he commenced his suit, or he may have received it as early as October 28, 1867. It is not even distinctly averred that his immediate grantor was not fully informed of the acts of fraud, though it appears inferentially in article 22 as a reason for not applying for a patent. But there is no averment at all as to the knowledge of the other parties who must have located the numerous mining claims, and, for aught that appears, might have conveyed to his grantor on the day before the issue of the patent, and with full knowledge of the frauds charged.

The great and substantial facts in the case are all facts of public record, and public proceedings under the law, and of public notoriety. The survey and the patent are of record, and open to everybody's inspection and examination. The incorporation of the defendant is a matter of public record. Notice of the survey appears from the allegations of the bill to have been published under the statute, and to have produced its proper results, as the bill shows upon its face that parties other than complainant's grantor actually appeared in the surveyor general's office as provided by statute, and filed therein objections to the survey on the very fundamental grounds of the fraud stated and relied on in this bill, and that the objections were over-ruled. Thus, not only the survey and patent, but the very facts charged as the equitable grounds for relief in this bill, were put on the public records of the surveyor general's office, and ruled upon by that office. The facts charged and the rulings, therefore, became public records prior to October 27, 1867, open to the inspection and examination of all; so, also, the fact, if it be a fact, that the grant was located in such a manner that it did not approach within 6 miles at the nearest point, or within 20 miles of some points, of the exterior bounds of the tract within which it could lawfully be located, and did

not include the residence of said Maria, or follow the *espediente*, or decree, was upon record in the survey and in the patent, and must have been known to complainant and his grantor; for it is alleged that the knowledge of the patent, and belief that it was valid, is the reason why they did not apply for patents for their numerous mining claims.   It was, therefore, known that the patent covered them; and it would appear from the allegations of the bill, inferentially, if not by direct averment, that plaintiff's grantor was for years in possession of his numerous mines with that knowledge.   All these are great, notorious, and public facts *actually known* to complainant's grantor, and presumptively to all mankind; and they are the fundamental facts of the fraud upon which whatever equity there is in this bill rests.   They are such facts as must necessarily have put the complainant and his grantor upon inquiry, and have long ago led to the discovery of the frauds.   They were facts which they were bound to notice, if they did not do so in fact.   They furnish a clue, which, if followed with reasonable diligence, would not require 13 years to lead to the fraudulent acts of the parties charged.   Even now the frauds are not positively alleged, but are cautiously charged upon information and belief; and the defendant is called upon by numerous interrogatories to furnish the proof of the frauds alleged.   Certainly the known facts were sufficient to arouse suspicion, and enable the complainant or his grantor to file a bill of *discovery on information and belief* long ago.   The location of the grant was in the nature of a proceeding *in rem*, and the party had a right under the statute to file objections, and some actually did, alleging these very frauds now charged.   These allegations were, therefore, of public record.   Parties cannot disregard known facts that lead to frauds affecting their rights, and, in the language of Mr. Justice Bradley, "then claim exemption from the laws that control human affairs, and set up a right to open up all the transactions of the past.   The world *must move on,* and those who claim an interest in persons or things must be charged with knowledge of their *status* and condition, and of the vicissitudes to which they are subject.   This is the foundation of all judicial proceedings *in rem." Broderick's Will,* 21 Wall. 519.   It must not be forgotten not only that the world "moves on," but that in this age and country, and in this part of the country, it moves rapidly.   Three years now, and especially in California, is longer, in events and progress, than 20 years some centuries ago, when the statutes of limitation were adopted in England.   Parties cannot lie down to sleep upon their

rights, and on waking up many years afterwards find them in the same condition in which they were left. Even Rip Van Winkle, in a slower period and among a slower people, when aroused from his 20 years' slumbers in the recesses of the mountains in the neighborhood of "Sleepy Hollow," found that the world had "moved on." The observations of the chief justice in *Vance* v. *Burbank*, 101 U. S. 520, are not inappropriate to this case. Among other things, he says, with reference to the facts of that case, "if any was in fact not sent forward, and Scott did not discover the omission until within one year of the time of the commencement of this suit, he must have been grossly neglectful of his own interests." The same may be said of the complainant in this case. If the open, known, notorious facts suggested in the bill, and apparent upon the public records of the county, did not in fact put the complainant and his "grantor" upon inquiry, and lead them to a discovery of the frauds charged, at least sufficiently to afford as good a basis upon which to file a bill of discovery containing general and sweeping charges "upon information and belief" as that upon which the present bill rests, they must, indeed, "have been grossly neglectful of their own interests."

In my judgment, upon both grounds discussed, the bill fails to present any grounds for the relief sought; and it is manifest, under the views expressed, that the bill cannot be truthfully so amended as to obviate the objections. The demurrer to the bill is sustained, and the bill dismissed. Let a decree be entered accordingly.