## DUGAN et al. v. O'DONNELL.

(Circuit Court, N. D. California. July 2, 1895.)

1. LIMITATIONS—DISAVOWAL OF TRUST.

Though mere lapse of time will not ordinarily bar the enforcement of a clearly-established trust, time will begin to run as soon as the trustee disavows the trust and claims adversely; and unless the cestui que trust was ignorant of the claim and of his own rights, lapse of time is a complete bar to relief.

2. LACHES—RELATIONSHIP OF PARTIES.

The doctrine of laches for delay in the enforcement of rights is not so strictly applied where the parties are relatives as in the case of strangers, but close relationship will not prevent its application if the delay is so great as to affect the memory of witnesses and destroy evidence.

3. SAME—NONRESIDENCE.

The nonresidence of the complainants, in a bill to declare respondent a trustee for them of an interest in an estate alleged to have been procured from them by fraud, will not, of itself, excuse a want of diligence in ascertaining and enforcing their rights.

4. SAME.

Where complainants, after actual notice that respondent, in possession of an estate in which they claimed an interest, was holding and claiming adversely to them, delayed 17 years in bringing suit, they are barred by their laches, though they were without full knowledge of all the facts, on the ground that equity will regard possession of the means of knowledge as equivalent to actual knowledge.

5. SAME.

In a suit to declare respondent a trustee for complainants of an interest in an estate and to set aside a probate decree of distribution confirming such estate in respondent, it appeared that respondent was a nephew of complainants' intestates, who were residents of a foreign country, and that he had possession of an estate in which all parties had an interest. By exaggerating the difficulty of preserving it, he induced his aunts to deed their interests therein to him, representing it to be for their interest, and, on presenting the deeds to the probate court, procured the decree giving him title. Thereafter he expressly informed them that he claimed all such interests as his own. It was alleged that they trusted him implicitly, but the evidence showed that they had agents secretly looking out for their interests, and accepted the consideration for the deeds on the advice of such agents. Suit was not brought until 20 years after the execution of the deeds, 17 years after notification of the adverse claim, and 11 years after the entry of the probate decree. *Held*, that after such lapse of time, and the death of some of the original parties and many of the witnesses, positive proof of the good faith of the transaction could not reasonably be required, and that in the absence of clear proof of fraud good faith will be presumed.

In Equity. Suit by Mary Dugan and others against Roger O'Donnell to declare respondent a trustee for complainants of an interest in the estate of Hugh O'Donnell, deceased, to set aside a probate decree for distribution of the estate, and for an accounting.

John J. Coffey, for complainants.
Galpin & Zeigler, for respondent.

HAWLEY, District Judge. This is a suit in equity to obtain a decree that the respondent holds in trust for the use and benefit of complainants certain property and interests in the estate of Hugh O'Donnell, deceased; that the judgment of distribution of the probate court of the city and county of San Francisco in said estate be set aside and vacated, on the ground of fraud upon the rights of complainants; that an accounting be had of all the dealings and transactions of respondent with said estate; and for such other and further equity as complainants may be entitled to.

Hugh O'Donnell died intestate February 6, 1868, at San Francisco, Cal., leaving one brother, Jeremiah O'Donnell, and three sisters, Catherine O'Donnell, Mary Gallagher, and Margaret McGonigle, residents of the county of Donegal, Ireland. All of them are now dead. The complainants are, respectively, the minor child and heir of Mary Gallagher, deceased, and the administratrix with the will annexed of the estate of Catherine O'Donnell, and guardian of the heirs. It is averred and claimed that complainant Mary Dugan is entitled to a one-fourth interest in the estate of Hugh O'Donnell, deceased, as the only child and heir of Mary Gallagher, and that the other complainants are entitled to one-fourth of the estate, as legatees of Catherine O'Donnell, deceased. It appears

from the testimony that the appraised value of the property of the estate of Hugh O'Donnell, deceased, in 1868, real and personal, was $48,510.50; that in 1871 there was an additional appraisement of $1,400, making a total of $49,910,50. Upon the real estate in the city of San Francisco there were certain incumbrances, viz. a mortgage lien of $25,000, held by the Hibernia Savings & Loan Society; allowed claims against the estate for about $6,000; a suit pending against the estate, brought by S. C. Hastings upon a rejected claim, for $20,000. To these would naturally be added the probable amount of the administrator's commissions, court costs, and attorney fees. The respondent is the son of Jeremiah O'Donnell, and, at the time of the death of his uncle Hugh, was, and for a long time prior thereto had been, a resident of the city and county of San Francisco, in the employ of his uncle, having active charge of all his property and business affairs, and was well advised in regard thereto. On the 13th day of February—one week after the death of Hugh O'Donnell—the respondent wrote a letter to his aunts in Ireland, informing them of the death of their brother, wherein he stated that their brother might have been worth £200,000 were it not for certain habits of his, which were minutely given; also stating an account of his sickness, the cause of it, the attendance during his illness, and the care given to him by the nurses, employed by the priests and by himself; that he died without a will,—and proceeds as follows:

"There are now forged wills, false claims, and heavy debts, twenty deep. He owes the Hibernia Bank $25,000, and over $5,000 current account. There is a large amount due other parties. But the worst of all is the public administrator, who will take all, if I can't prevent him, 30 days after my uncle's death. If he succeeds, never will a dollar reach Ireland at all; nor is it likely that I will get a cent, even, for all my time. If I defeat him, you will have more riches than you ever dreamed of. I am in possession. I have collected rents for last year and a half. I got power of attorney from my uncle before he left here; but all will be too little, I fear. I have the best lawyer in the city. He tells me [to] get power of attorney from my father and you, both; and then I can act as agent against all false papers, claims, or public administrator. This man, if he gets the property, would sell all out, after a certain number of days, to some friend of his own, or by bribe, for half its value. He would charge 10 per cent. commission. The fees of his officials and probate court expenses would be at least $10,000. These papers enclosed will give me your power of attorney, which, with my own power, will defeat all of them here. Go, both of you, to Derry, with my father, immediately, before the American consul, to sign them. I write my father to-day. If you get this letter before his reaches, go up to him. If his should not reach in two days, let him go with you both to Derry. Have them signed and posted at once. I have no time to write further.

"I am, affectionately, your nephew,                                  R. O'D."

On the margin of this letter appears the following:

"All the priests here are extremely anxious about this matter. Speak not a word of this. Say nothing until I write you again, when I trust in Almighty you'll have good news."

On the 28th of February, 1868, the public administrator filed a petition for letters of administration upon the estate of Hugh O'Donnell. On March 13, 1868, the respondent was appointed administrator of said estate. On June 29, 1868, the respondent sent

a letter to his aunts, wherein he said, after referring to certain stories about Reverend Hugh P. Gallagher:

"It is a sad case to see quarrels so early after my uncle's death. You'll understand we have got very formidable enemies outside to contend with, without disgracing ourselves and disgusting the few good friends here who interested themselves for the benefit of all concerned. If I wanted to take any advantage of my people, there was nothing to prevent me, nor more easy. I have written you already that my uncle's mind was not clear after the first week's illness. I wrote so, least you thought a will was then made which I put aside. I was told more than once to get a will made, which must have certainly been in my favor. My reply was that my father and aunts were alive, and that they and I would settle all peaceably and justly. You ought not to think that I did away with the old will, in which it is well known I was left a large share, and appointed, executor. If I destroyed it, I would ruin myself. What I have written before and now are facts, and my letters there or here will bear me out in truth, and that I wanted nothing done but justice to you all. You could not believe there would be false claims; but, unfortunately, there are many and large claims presented to me already, and sworn to, amounting to almost $47,000. * * * And you'll think it strange that, about the very day Aunt Mary's letter reached here, I was served with summons and complaint by Judge Clinton S. Hastings for the recovery of $20,000. * * * I have sent a copy of both to my father, which you can get from him. He was formerly judge of the supreme court here, and a man of great wealth and influence. * * * My uncle's property was appraised some time ago by three real estate agents, who were sworn, at the amount of $48,510.50; so, you see, if false claims are allowed, all is done. My grief is great to-day, to see my own nearest and dearest maligning me, all alone among strangers in a strange land; and to see a fortune in my hands now going to be eaten up by lawyers and unscrupulous cormorants. * * * The papers you signed for me were worthless,—of no consequence. I administered in the beginning of March. I defeated the administrator. A great blessing that was, under present circumstances. Your kind letter came to hand, and gave me pleasure. Lawyers, doctors, and nurses are daily asking money, which they must have. * * *

    "Affectionately yours,            R. O'Donnell."

There is in the record a letter from respondent to his father, which bears no date; and it is left in doubt as to the time it was written,—whether before or after the execution of the deeds hereinafter mentioned. It contains directions as to how the deeds should be executed. The writer, among other things, said:

"I now tell you I never would get a dollar of the money I sent aunt, only it was well known these Gallaghers wanted to wrong me. This Father Gallagher thought I would just do everything he wanted to have done; but not yet. I'll never enter his door, and I have no correspondence with any of the crowd. I again state to you that I will not be able to send you the money as I stated. It is doubtful whether the bank will give me $6,000 on my one-half interest. If I had three-fourths interest, I could draw $7,000, or $8,000, to pay my creditors and you. * * * You did not say if I was right about him [refers to Rev. Hugh Gallagher] sending the second part of checks to aunt. They said long ago that my uncle's estate came badly, and would have a bad end (when Hastings sued for all), but they would take a slice of it after all. With the help of Providence, I'll keep it together, and in my hands it will yet grow to be large."

It appears that, prior to October 11, 1869, an offer was made to the aunts through Father McGroarty, of £300 sterling for their interest in the estate. Afterwards, an offer was made for both their interests for $5,235. As a result of these negotiations, deeds regular upon their face were executed, whereby respondent acquired their right, title, and interest in and to all the property inherited by them

from the estate of Hugh O'Donnell.   The first deed, executed October 11, 1869, was acknowledged before William F. Black, J. P., at Lislap, Omagh, County Tyrone, Ireland; and the fact of Black being a justice of the peace is properly certified to by the American consul for Londonderry.   The respondent, after the receipt of this deed, to wit, on April 21, 1870, sent a letter to his father stating that the deed could not be recorded, whereas, as a matter of fact, it had, three days prior to that time, been duly recorded at the request of respondent.   The letter explained the imperfect acknowledgment, and the necessity of having the particular acknowledgment of deeds executed outside of California, as required by the statute. This letter mentions, at great length, the difficulties under which respondent was laboring to raise ready money, and states that his father ought to be happy "if I'm able to pay you more than a stranger now for your share, and keep the estate together"; that the ratio is a fair one; that if the writer had not been in this country, not a dollar would have reached Ireland; that, to quote his language, "had I done anything wrong or wanted to defraud one, any or the other, those false friends of mine would expose it.   How easy was it not for me to have a will made giving me all I wanted, and which I was advised to do; but, for sake of home, I did not do so, because, had a will been made, Ballinamore would get but little."   There is a lengthy and detailed statement as to what the writer could afford to pay the father for his fourth interest, how the property is incumbered, the amount of the debts, interest due, etc., and closes as follows:

"And if I did get the estate a few thousand cheaper than some Jew or speculator, who has a better right?   And when I give the full price, I think you ought to be proud and happy I am able to keep it out of passing into strangers' hands, perhaps at a sacrifice.   I'm sorry you wrote this Father Gallagher, the sharpest speculator of all.   He wanted my aunt's power of attorney to make me pay him heavy commissions; but he is out now.   * * *   Have I not need to pray to the Almighty God to extricate me out of my great difficulties?   Again I earnestly crave your immediate attention to having those two deeds of my aunts properly executed, and register the letter to me."

On July 30, 1869, the aunts executed the second deed, confirmatory of the prior deed, signing it in the presence of Jeremiah O'Donnell, who signed as a witness thereto.   The acknowledgment to this deed was made by him, in the usual form of a subscribing witness, before the American consul at Londonderry, Ireland, on the 10th of August, 1870, and the deed was duly recorded in the office of the recorder in San Francisco, on the 20th of October, 1870.   On September 21, 1871, the probate court, in the estate of Hugh O'Donnell, made an order appointing an attorney to represent the absent heirs.   Jeremiah O'Donnell died in 1872, and in 1873 the respondent visited his aunts in Ireland, and then claimed to be the sole owner of three-fourths of the estate of Hugh O'Donnell.   On May 1, 1876, the Hibernia Savings & Loan Society commenced a suit to foreclose its mortgage, and on February 27, 1877, a decree of foreclosure was regularly made and entered therein.   The other proceedings thereafter had in said suit may be briefly stated.   The property was sold by the sheriff, and a certificate of sale was given

to James McDevitt, who paid no money therefor. On May 7, 1877, McDevitt assigned this certificate to the Hibernia Savings & Loan Society. On December 15, 1877, a sheriff's deed was executed in pursuance of the proceedings, and delivered to said banking society. On January 17, 1878, the Hibernia Savings & Loan Society executed a deed of the property, described in the certificate of sale, to James McDevitt, and on the next day he executed a mortgage to the bank for the purchase money. On November 11, 1879, a decree of final distribution in the estate of Hugh O'Donnell was regularly made and entered in the probate court, giving to respondent three-fourths of said estate, and to Margaret McGonigle one-fourth. On October 30, 1880, James McDevitt deeded the property which had been conveyed to him to the respondent. Mary Gallagher died in 1882. Margaret McGonigle died in 1888. The original bill of complaint was filed December 1, 1890. Catherine O'Donnell died March 12, 1892. Several demurrers to the original and amended bills filed by complainants were sustained. The bill of revivor was filed November 13, 1893.

Upon the facts, complainants' contention is that there was a gross inadequacy of consideration for the deeds; that the respondent, being a man of education, experience, and shrewd business habits, was regarded by his aunts as worthy of their confidence; that they had implicit faith in his justice and honesty of purpose towards themselves; that they accepted without inquiry all representations made by him concerning the estate, as true; that he constituted his father, by the correspondence between them, as his agent to convey his representations concerning the estate to the aunts; that, by virtue of his appointment as administrator of the estate, he became, and was, the trustee of the heirs of said estate; that, pretending to discharge the duties of his trust as such administrator, he did, knowingly, dishonestly, and fraudulently, and in direct violation of his duties and obligations as such trustee, procure from his aunts the deeds of their interests in said estate, upon false representations that the property of the estate was in danger of being lost, and that it was necessary to have said deeds to enable him to resist the threatened litigation against the estate; that the money paid to them for the execution of their deeds was represented by respondent as being a portion of the estate due to them; that neither of them ever understood that any part of said money was paid from the private funds of respondent; that all of respondent's dealings with them concerning the estate were deceptive and fraudulent, and were carried on with the object and purpose of defrauding them of their just rights; that his letters were so written, and couched in such language, as to wholy allay their fears, by appealing to their religious faith and close relationship with respondent; that, while pretending to be frank, open, and fair, he concealed from them the true condition of affairs, etc. From the statement of facts, it will readily be seen that the ground floor upon which complainants' rights are based is primarily founded upon the two letters written by respondent to his aunts. The letters written by respondent to his father, not referred to in the statement of facts, were written after

the execution of the confirmatory deed by the aunts, and anything therein contained could not be said to have in any manner influenced their action in the execution of said deeds. Moreover, the answer specifically denies the averment in the bill that Jeremiah O'Donnell was appointed the agent of respondent to negotiate with the aunts for the sale of their interest in the estate, and there is no proof in the record to sustain this averment. It is contended, on behalf of respondent, that there is nothing in either of the letters which was false. This, if true, would virtually constitute a complete defense to the suit; for, if the deeds from the aunts were executed with full knowledge of all the facts, without any false representations upon the part of the respondent, there would be no solid foundation upon which complainants could stand in a court of equity. Without stopping to closely analyze the contents of the letters, or to point out the statements therein made that were true, it is enough to say that some material facts were not stated. There was a detailed reference to the claims, just and unjust, against the estate, but no reference whatever to the rents and income from the property, which, within a year, amounted to as much as was paid to the aunts for their interest in the estate. There were no forged wills. The difficulties in preserving the estate from unjust claims and keeping it out of the hands of the public administrator, while not untrue, were greatly magnified.

Assuming, therefore, that the aunts could have maintained their suit, upon its merits, if it had been brought within a reasonable time, the question arises whether they have not lost their rights by laches and lapse of time after acquiring knowledge, or having the means to obtain knowledge, of the true state of the facts. The office of trustee is important to the community at large, as well as to the parties immediately interested, and is especially so to parties who are, from any cause, unable to care for themselves. It is naturally one, in all cases, of great confidence. The law wisely and justly regards every person holding such a position with jealous scrutiny, and denounces in severe terms even the slightest attempt to pervert his position, duties, and powers for his own interest, profit, or benefit. As a general rule, mere lapse of time is no bar to the enforcement of a trust clearly established; and, where fraud is imputed and clearly proved, length of time ought not, of itself, to exclude relief. Prevost v. Gratz, 6 Wheat. 481, 497; Michoud v. Girod, 4 How. 503, 560; Lewis v. Hawkins, 23 Wall. 119, 126; Railroad Co. v. Durant, 95 U. S. 576. This rule is in accordance with the reason upon which it is founded, and is subject to many qualifications, which are as well established as the rule itself. For instance, time begins to run against a trust as soon as it is openly disavowed by the trustee, by insisting upon an adverse right and interest which is clearly and unequivocally made known to the cestui que trust. Unless there has been a fraudulent concealment of the cause of action, and the complainants have remained in ignorance of their rights, lapse of time is as complete a bar in suits of equity as in actions at law. Elmendorf v. Taylor, 10 Wheat. 168; Badger v. Badger, 2 Wall. 87; Speidel v. Henrici, 120 U. S.,377, 386, 7 Sup. Ct.

610. Every case must necessarily be decided in accordance with its own particular circumstances, after taking into consideration all of the elements which, in any manner, affect the question. If it could be said in this case, as it was in Michoud v. Girod, supra, that the court could only see in the conduct of the complainants "the fears and forbearance of dependent relatives, far distant from the scene of the transactions of which they complain, desirous of having what was due to them, and suspecting it had been withheld, but unwilling to believe that they had been wronged" by their nephew, in whom they reposed confidence, there would be no difficulty in declaring, as was done in that case, that complainants had not lost their rights "by negligence, or by the lapse of time." It is unquestionably true that the relationship of the parties always has an important bearing on the question of laches, and that delay under such circumstances is not as strictly regarded by the courts as in cases where the parties are strangers to each other. Paschall v. Hinderer, 28 Ohio St. 568; 2 Story, Eq. Jur. § 1520. But if the delay is of so great a time as to destroy evidence, it may and will, even in cases of close relationship, be such as to require a court of equity to refuse relief. Haff v. Jenney, 54 Mich. 513, 20 N. W. 563. The nonresidence of the complainants, while a proper matter for consideration in the determination of the facts, does not of itself excuse a want of diligence upon their part in endeavoring to ascertain and enforce their rights. Broderick's Will Case, 21 Wall. 519; San Jacinto Tin Co. Case, 7 Sawy. 433, 9 Fed. 726; Teall v. Slaven, 14 Sawy. 364, 370, 40 Fed. 774. But in this case, independent of the relationship of the parties and the nonresidence of the complainants, it affirmatively appears from the evidence that the aunts, pending the negotiations between the respondent and themselves for their interests in the estate, did not confide in the representations and statements made by respondent, as claimed in the bill of complaint; but, on the contrary, they had two agents to look after their interests in said estate, in whom they especially confided. Both were priests,—one, Father Hugh Gallagher, residing in San Francisco, the other, Father McGroarty, in Ireland. Both are now dead. In answer to certain cross interrogatories propounded to her, Catherine O'Donnell said, with reference to one of the letters she received: "When I saw this letter, I found that Roger O'Donnell was not, in my opinion, intending to [do] right by me." She also testified that "Father John McGroarty, who lived in Killygonden, held the money that was to be paid for the deed. * * * I was paid £524 by Bernard Martin, shop assistant to William McGroarty, brother of Father McGroarty. * * * Father McGroarty first received £300 to offer to us, but we refused it. Afterwards the offer was increased to £524. I was acquainted with Father Hugh Gallagher. I had one letter from him in regard to the estate of Hugh O'Donnell. I wrote to him in answer, and sent him a power of attorney to act for me in looking after my interest in said estate." After these negotiations as to the price to be paid, the aunts received and accepted the sum of $5,235 for the execution of of a deed of their interest in the estate. Some months after the

execution of the first deed, owing to defects in the acknowledgment thereof, they executed a second deed. There is no denial of the signing of these deeds; but it is claimed by counsel for complainants that the aunts were at the time totally ignorant of the true character of the documents they signed, and that they supposed them to be only powers of attorney authorizing the respondent to act as administrator, so as to defeat the application of the public administrator. Catherine O'Donnell, after stating in her deposition that she did not know William F. Black, the justice of the peace who took the acknowledgment to the first deed, and was never at his office, said:

"I signed a paper at Raphal, County of Donegal, in Mr. Wilson's office, as also did Mary Gallagher; but Jeremiah O'Donnell was not present. I do not recollect who advised us to sign. I only signed the papers altogether. The first I was made to believe was a power of attorney to Roger O'Donnell; but from something I afterwards heard, I signed the second paper, recalling the first. Jeremiah O'Donnell told Mary Gallagher and myself that if we did not sign the first paper, giving power of attorney to Roger O'Donnell, we would get nothing."

This testimony is not clear. It is, in several respects, confusing and uncertain in its character. The aunts were not wholly uneducated. Both could read, and one, at least, could write. They knew something about business. They did not trust their nephew. They relied upon the priests,—confided in and consulted with them about accepting the price offered by the respondent. They agreed upon the amount, accepted the money, and then executed the deeds. That a power of attorney was signed by them, at some stage of the transactions, seems probable and reasonable, as it was asked for in the first letter written by the respondent, in order to enable him to defeat the application of the public administrator that was likely to be—and was, thereafter—made to the probate court for letters of administration; but no money was offered for the execution of any power of attorney, and it seems unreasonable to believe that the aunts would have demanded any money for the execution of such a power of attorney. The reference made by the respondent, in the second letter, to "papers," evidently referred to the deeds, because at the time this letter was written he had already received letters of administration from the court, and no power of attorney was then necessary to enable him to act. In the light of all the facts, it seems improbable that the aunts could, at the time of the execution of the instruments, have thought that either one of the deeds which they signed was only a power of attorney. It is more natural and reasonable to believe that, owing to the great lapse of time, the recollection of the witness is rendered somewhat uncertain as to the real character of the papers she had signed, and of the time, place, and manner of their execution. But, be that as it may, it further affirmatively appears that, if the aunts did sign the deeds in ignorance as to their true character, they afterwards became aware that the respondent claimed the property as his own. In 1873 —more than two years after the execution of the second deed—the respondent visited his aunts in Ireland, and, in conversations with

them, claimed to be the owner of three-fourths of the estate. Catherine O'Donnell testifies, in regard to his visit:

"He remained in Ireland over a year. I saw him frequently during his stay. He lived around among friends, and was occasionally at my house. There was nothing particular took place between myself and Mary Gallagher. Roger O'Donnell seemed to be glad in his idea that he was the sole owner of Hugh O'Donnell's estate."

It thus appears that the aunts had notice in 1873 that respondent was claiming interests in the estate adverse to them. The law does not require actual knowledge of all the facts. If the aunts failed, or omitted, to obtain knowledge, when it was obtainable after notice, or the circumstances were such as would reasonably have induced an inquiry and an effort to obtain full knowledge, it is sufficient to hold the parties guilty of laches in exercising reasonable diligence to enforce their rights; because "the possession of such means of knowledge is, in equity, the same as knowledge itself." New Albany v. Burke, 11 Wall. 96, 107; Bowman v. Wathen, 1 How. 189; Wood v. Carpenter, 101 U. S. 139; Teall v. Slaven, supra; Sedlak v. Sedlak, 14 Or. 540, 13 Pac. 452. In 2 Pom. Eq. Jur. § 965, the author, in announcing the general principles applicable to acquiescence and lapse of time, among other things, said:

"When a party, with full knowledge, or at least with sufficient notice or means of knowledge, of his rights, and of all the material facts, freely does what amounts to a recognition of the transaction as existing, or acts in a manner inconsistent with its repudiation, or lies by for a considerable time and knowingly permits the other party to deal with the subject-matter under the belief that the transaction has been recognized, or freely abstains for a considerable length of time from impeaching it, so that the other party is thereby reasonably induced to suppose that it is recognized, there is acquiescence, and the transaction, although originally impeachable, becomes unimpeachable in equity."

Numerous authorities are cited in support of this text, and the cases of Gresley v. Mousley, 4 De Gex & J. 78, Baker v. Bradley, 7 De Gex, M. & G. 597, and Michoud v. Girod, 4 How. 503, 561, which are cited and specially relied upon by complainants, are referred to as "remarkable instances of relief given after a considerable lapse of time." These cases, however, as before intimated, are essentially different in their facts from the present case.

The failure of complainants to specifically state and prove the impediments, if any existed, to an earlier prosecution of the suit, is another reason, often assigned by the courts, why the relief asked for should be denied. Badger v. Badger, 2 Wall. 87; Sullivan v. Railroad Co., 94 U. S. 806; Godden v. Kimmell, 99 U. S. 211; Lansdale v. Smith, 106 U. S. 394, 1 Sup. Ct. 350. It was 20 years after the execution of the deeds before the original bill herein was filed,—17 years after the original complainants had knowledge that respondent claimed the property adversely to them, and 11 years after the final decree of distribution of the property of the estate. Length of time necessarily obscures, or tends to obscure, all human evidence, and very often removes from the parties the means of verifying and making certain the exact nature of all the original transactions. These things are said to operate, by way of presumption,

in favor of innocence and against the imputations of fraud. It is unreasonable, after such a great length of time, to require positive proof of all the minute circumstances of any transaction, or to expect a satisfactory explanation of every difficulty, real or apparent, with which it may be incumbered. The most that courts can expect, if the parties are all living, owing to the frailty of memory and human infirmity, is that the material facts can be given with certainty to a common intent. But, if some of the parties and many of the witnesses are dead, as is the case here, the most that can ordinarily be expected is to arrive at probabilities, and substitute general presumptions of law for actual knowledge. It therefore follows that, in all such cases, fraud and wrongdoing ought not to be imputed to the living, unless the evidence of fraud upon one side, and lack of knowledge, or means of knowledge, upon the other side, are made clear beyond a reasonable doubt. U. S. v. Beebee, 17 Fed. 37; Hinchman v. Kelley, 4 C. C. A. 189, 54 Fed. 63; Hammond v. Hopkins, 143 U. S. 224, 274, 12 Sup. Ct. 418. Having carefully examined all the facts and circumstances of this case, and duly considered the principles of law applicable thereto, my conclusion is that the defense of laches and lapse of time must be sustained.

The views already expressed are conclusive of the case, and render it unnecessary to consider the further question presented by the facts, whether the title of the respondent derived from the proceedings had in the probate court was of such a character as would, of itself, enable the respondent to defeat the suit as to the property therein involved. The respondent is entitled to a decree dismissing the bill, with costs.